02-11-272-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00272-CV

 

 


 
 
 In the Interest of J.D.S., Jr., K.L.S., and D.A.S.
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 325th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

 

Appellant
L.E. (Mother) appeals the judgment terminating her parental rights to three of
her children, J.D.S., Jr.; K.L.S.; and D.A.S.  She argues in one issue that the
evidence is factually insufficient to prove that termination of her parental
rights is in the children’s best interest.  Mother does not challenge the trial
court’s section 161.001(1) findings.  We affirm.

II. 
Background

Trial
to the court began on June 20, 2011.  J.D.S., K.L.S., and D.A.S. were eight,
six, and four years old, respectively, at the time.  Each of the children’s
fathers either failed to appear at trial or signed an affidavit relinquishing
parental rights, and only Mother has appealed the trial court’s judgment.

In
September 2007, Mother placed her children into the backseat of a vehicle in
which she was a passenger.  Mother admittedly failed to restrain the children
with seatbelts or child-safety seats, and they were each ejected from the
vehicle and injured when the vehicle was involved in a collision.  The
Department of Family and Protective Services (the Department) removed the
children from Mother’s care for approximately six months after the accident. 
Mother later pleaded guilty to one count of child endangerment, and the trial
court placed her on community supervision for three years.

The
Department received a second referral concerning the children in October 2008,
this one alleging drug use, domestic violence, and physical abuse of the
children by Mother’s then-boyfriend C.G.  Mother denied any recent domestic violence
or drug use.  J.D.S. was interviewed and described hiding a few months earlier
with his sisters and seeing adults hitting each other.  J.D.S. also talked
about wanting to call 9-1-1 but being afraid to do so, saying that he “would
get a whooping.”  The Department did not remove the children at the time based
on insufficient evidence of ongoing domestic violence.

In
September 2009, J.D.S.’s school counselor called Mother’s house because J.D.S.
had missed two or three consecutive days of school.  Six-year-old J.D.S.
answered the telephone and talked with the counselor for thirty to forty-five
minutes, telling her that he had been home alone with his sisters for what the
counselor believed was about two hours.[2]  The counselor testified
that she could hear screaming in the background and that she stayed on the
telephone with J.D.S. until the school’s liaison officer arrived to check on
the children’s welfare.  In addition, a teacher from J.D.S.’s school testified
that she had seen Mother, during the fall of 2009, transport the children after
school by car “many times” without safety restraints.  Also during the fall of
2009, J.D.S. had twenty-two unexcused absences, nine excused absences, and
nineteen late arrivals, and K.L.S. had twenty-six unexcused absences, twelve
excused absences, and thirteen late arrivals.  J.D.S.’s teacher testified that
he was disruptive in class and behind academically, and she said that J.D.S.
was depressed and crying at school four out of five days per week.

In
January 2010, the Department received another referral involving domestic
violence in Mother’s home.  C.G. pushed Mother, and Mother hit C.G. with a
candlestick holder.  The children were removed and placed into foster care
following this incident.  Mother subsequently pleaded guilty to assault causing
bodily injury to a family member and was sentenced to forty-five days’
incarceration.  Because of the new assault conviction, Mother also had pending
at the time of trial a motion to adjudicate guilt for the 2007 child endangerment
charge, and she faced the possibility of further incarceration.

During
the spring of 2011, the Department considered placing the children with
Mother’s grandmother, A.B., and the Department arranged for the children to
have nine visits with A.B. at her home.  The Department discontinued the
visits, however, because Department personnel believed that A.B. was permitting
Mother to visit the children despite repeated instructions to not allow Mother
access to the children during the visits.  Department caseworker Tyra Sasita
testified that the children reported being told to lie to the Department about
seeing Mother during the visits.

III. 
Discussion

Mother
argues that the evidence is factually insufficient to support the trial court’s
finding that termination is in the children’s best interest.

A. 
Standard of Review

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625,
629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also § 161.206(a) (West 2008).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the termination of the parent-child relationship would be in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001; In re C.H.,
89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed
evidence that a reasonable factfinder could not have credited in favor of the
finding is so significant that a factfinder could not reasonably have formed a
firm belief or conviction in the truth of its finding, then the evidence is
factually insufficient.  H.R.M., 209 S.W.3d at 108.

B. 
Best Interest Considerations

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  In determining the best interest of the child, the trier of fact in a
termination case may use the following factors:

(A)        
the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of
the individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home
or proposed placement;

(H)     the acts or omissions of
the parent which may indicate that the existing parent-child relationship is
not a proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

C. 
Application

There
is no question that the children love Mother and A.B., are bonded with their
family, and want to return home or to live with A.B.  Mother notes the
children’s fear of returning home if C.G. were still there but points to her
testimony that she is no longer in a relationship with C.G.  The Department
counters that the children’s fear of C.G. reflects that “[e]ven these small
children . . . understood that returning to [Mother’s] care
might not be in their best interest.”  In that regard, the children’s counselor
testified that K.L.S. likes the safety of foster care, that the children spoke
of the domestic violence they had witnessed in Mother’s home, that the children
had bonded with their foster mother, and that the children were not so attached
to Mother and their biological family that they could not be successful if
Mother’s parental rights were terminated.  See In re A.C.H., No.
02-11-00072-CV, 2012 WL 1345759, at *12–13 (Tex. App.—Fort Worth Apr. 19, 2012,
no pet.) (mem. op.) (affirming best interest finding but noting strong bond
between children and parents despite history of domestic violence).

Mother testified that she had
not been in an abusive relationship during the eighteen months before trial,
and she argues that termination is not proper because she has distanced herself
from previous abusive relationships.  However, Mother has an almost ten-year
history of being in abusive relationships.  Both of the childrens’ fathers and
C.G. physically abused Mother, and Mother pleaded guilty to assaulting C.G. 
J.D.S. has nightmares about C.G. hitting him and his sisters.  Moreover, Mother
pleaded guilty to child endangerment following the 2007 car accident in which
all three children were ejected from the vehicle, and the trial court heard
testimony that Mother was, two years later, still transporting the children by
vehicle without proper restraints.  Mother also left the children at home alone
without adult supervision on at least one occasion; they were alone for at
least thirty minutes because the school counselor was on the telephone with
J.D.S. for that long before police arrived.

J.D.S. and K.L.S. had
excessive absences from school, and J.D.S. has struggled academically.  Mother
acknowledges that the children had academic and behavioral issues, but she
argues that the evidence does not show that termination would address their
needs because the children had made only minimal progress in foster care. 
There is evidence, however, that the children’s academic and behavioral
problems resulted from living in Mother’s home.  The children have had extreme
temper tantrums, with one such tantrum by D.A.S. lasting a full hour during a
parental visitation.  The children’s behavior was referred to as “Abuse
Reactive Behavior,” which their counselor described as “a trauma response” seen
in “children who have been in an abusive environment, and they act out
aggressively.  It’s a way of when they have felt powerless they want to
compensate for those feelings by being aggressive toward other children.”

The counselor described
J.D.S. as very impulsive, very moody, overly sensitive to criticism, angry, and
physically and verbally aggressive.  She testified that he has poor social
skills, relationship problems with “just about everyone,” tantrums, and poor
self-management skills, and she said that he bullies his siblings.  She also
described J.D.S.’s nightmares, saying that he “talks about having dreams of a
sex offender ghost.”  The counselor testified that K.L.S. is also physically
and verbally aggressive and moody; that she is disruptive at school, easily
distracted, and very disrespectful to adults; and that she has relationship
problems and nightmares about people fighting.  Four-year-old D.A.S. is
similarly physically and verbally aggressive, moody, angry, and defiant, and she
cries easily.  She also uses foul language and has poor social and relationship
skills.  There is testimony that the children will require long-term counseling
and academic guidance and that they need a caregiver with strong parenting skills.
 See In re J.L.B., 349 S.W.3d 836, 848–49 (Tex. App.—Texarkana 2011, no
pet.) (affirming best interest finding and noting among other things that
children’s emotional and physical needs would be better served with parents
more like their foster mother, that the children needed therapy, and that they
had delayed intellectual, social, and emotional development).

Mother has been diagnosed
with a bipolar disorder.  Dr. Balla testified that although Mother is capable
of learning, stress and new situations are difficult for her, and Mother’s
counselor testified that Mother could benefit from further counseling.  Mother
argues that counseling would still be available to her if her parental rights
are not terminated, and she points to evidence that she can adequately parent
the children once her bipolar disorder is stabilized with medication, a process
that can take twelve months and that can require continual medication
adjustments, and she notes that she did not ask the trial court for immediate
custody of the children.  Mother also points to evidence that she had completed
most of her service plan, that drugs are not a problem for her, and that she
had allegedly done reasonably well during her community supervision following
her assault conviction.  Mother, however, did not show up for her first six
individual counseling appointments.  She also told the caseworker that she
would not work any other services until the Department returned the children to
her or gave them to A.B.  See In re A.W.B., No. 14-11-00926-CV, 2012 WL
1048640, at *6 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem.
op.) (noting in best interest review that the mother did not complete
psychiatric therapy despite her knowledge that failure to do so could result in
termination of her parental rights).  The Department also attempted group
counseling for Mother, Mother’s mother, and A.B.  The attempt was unsuccessful,
however, because the women insisted that they did not want group therapy, that
they already had ways of working through issues in their relationships, and
that they did not see the need or potential benefit of therapy.  The women
attended only one group therapy session.

The trial court also heard
testimony that Mother had not shown a willingness to learn and had instead blamed
the children for not yet being returned to her.  Moreover, Mother interacted
appropriately with the children during only about five out of more than twenty
visitations, sometimes sleeping and often completely withdrawing from the
children.  Witnesses reported hearing Mother mock the children for having
nightmares and telling them they would never come home if they continued
talking to Department personnel.  The caseworker testified that Mother and A.B.
instructed the children not to tell anyone that Mother had been present at
A.B.’s home during visitations in 2011, telling J.D.S. that he would get a
“whooping” if he told Department personnel the truth.  K.L.S. reportedly told
Mother that the Department was watching her, and Mother responded by telling
K.L.S. to “shut up.”  See Sanders v. Tex. Dep’t of Protective &
Regulatory Servs., No. 03-03-00633-CV, 2004 WL 1269335, at *4 (Tex.
App.—Austin June 10, 2004, no pet.) (mem. op.) (affirming best interest
determination and noting that father did not understand reasons for child’s
removal, blamed others, and did not avail himself of services offered to regain
possession of child).

The children’s foster mother
did not testify at trial, and there is evidence that she had given the
Department a thirty-day notice, meaning the Department had to find a new
placement for the children.  There is no evidence of where the children were
subsequently placed, and other than continuing the children in counseling, the
Department’s plans for the children (such as eventual adoption) were not set
forth at trial.  Even so, Mother had a pending motion to adjudicate guilt for
the 2007 child endangerment charge and faced the possibility of incarceration. 
In addition, Mother had not located stable housing in the almost eighteen months
following the children’s removal in February 2010.  She testified that she had
applied for housing through her MHMR caseworker but that she was on a waiting
list, and Mother acknowledged that she did not currently live in a home
suitable for the children.  Moreover, Mother’s income is approximately $500 per
month in social security benefits, and she has a $300 per month car payment.  See
R.R., 294 S.W.3d at 237 (explaining that father’s difficulty maintaining
safe and stable housing, inconsistent employment history with no guaranteed
income, and inappropriate choices that endangered children demonstrated that termination
of parental rights was in children’s best interest).

Mother’s plan is for A.B. to
have custody of the children until Mother is able to assume custody.  A.B.
testified that she wants the children to go to school, church, and college and
to be the best persons they can be.  The Department argues, however, that
Mother’s plan is untenable.  In that regard, the trial court heard evidence
concerning A.B.’s fitness to have custody of the children.  Despite repeated
instructions in 2011 that Mother was not to be present or have access to the
children during visitations at A.B.’s home, the children reported that Mother
attended the visitations.  A.B. had also allowed Mother unsupervised access to
the children in 2008 against the Department’s instructions, and the caseworker
testified that A.B. does not see that Mother has engaged in endangering conduct
toward the children.  Although A.B. testified that she would follow the
Department’s instructions and any court orders if she had possession of the
children, the trial court could have disbelieved her testimony and could have
instead believed, based on all the evidence, that A.B. would give the children
to Mother or allow Mother improper access to the children if A.B. thought the
Department would not know about it.

Moreover, A.B.’s availability
for placement is not itself a bar to the termination of Mother’s parental
rights.  As we have stated,

Reasonable efforts should be made
with respect to a child to be placed in foster care to preserve and reunify
families and to give preference to an adult relative over a non-related
caregiver in determining the placement of a child.  In re C.C., No.
02-04-00206-CV, 2005 WL 1244672, at *6 (Tex. App.—Fort Worth May 26, 2005, no
pet.) (mem. op.) (citing 42 U.S.C.A. § 671(a)(15)(B), § 671(a)(19) (2003)).  However,
Appellant provides no authority to suggest that there is either a statutory or
a common-law duty imposed on the Department to make such a placement or to
investigate such a placement before a party’s parental rights may be
terminated.  The determination of where the child will be placed is a factor in
evaluating the child’s best interest, but it is not a bar to termination that
placement will be with non-relatives.  Id. at *7; Rogers v. Dep’t of
Family and Protective Servs., 175 S.W.3d 370, 379 (Tex. App.—Houston [1st
Dist.] 2005, pet. dism’d w.o.j.).

In re K.W., No. 02-09-00041-CV, 2010 WL 144394,
at *10 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.).  Thus, A.B.’s
willingness to accept placement is but one consideration in the overall
determination of whether termination of Mother’s parental rights is in the
children’s best interest.

Although much of it was
contested and conflicting, the trial court heard evidence that Mother
personally endangered the children by transporting them in vehicles without
safety-restraints; by exposing them to years of domestic violence that led to
their nightmares, fears of returning home, and behavioral problems; by failing
to ensure their routine and timely attendance at school; and by failing to
recognize the risks to which she exposed the children and the need for change. 
The trial court also heard evidence that A.B. did not recognize the safety
risks to the children caused by Mother’s acts and omissions or the need for
Mother to change and that A.B. repeatedly ignored the Department’s admonitions
to limit or prevent Mother’s access to the children.  Based on all the evidence,
the trial court could have agreed with the court-appointed special advocate’s
testimony that termination of Mother’s parental rights was in the children’s
best interests.  Thus, after reviewing the entire record and giving due
deference to the trial court’s findings, we hold that a factfinder could
reasonably form a firm conviction or belief that termination of the
parent-child relationship between Mother and the children would be in the children’s
best interests.  See H.R.M., 209 S.W.3d at 108; C.H., 89 S.W.3d
at 28; see also Tex. Fam. Code Ann. § 161.001(2).  We therefore
hold that factually sufficient evidence supports the trial court’s
determination that termination of the parent-child relationship between Mother
and the children is in the children’s best interests.  We overrule Mother’s
sole issue.

IV. 
Conclusion

Having
overruled Mother’s sole issue, we affirm the trial court’s judgment.

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
GARDNER,
MEIER, and GABRIEL, JJ.

 

DELIVERED:  June 14, 2012








 









[1]See Tex. R. App. P. 47.4.





[2]The counselor had asked
J.D.S. about the television shows he had watched while home alone and checked
the television show times to calculate the length of time the children were home
alone.