

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00272-CV

IN THE INTEREST OF J.D.S., JR.,
K.L.S., AND D.A.S.

----------

FROM THE 325TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant L.E. (Mother) appeals the judgment terminating her parental rights to three of her children, J.D.S., Jr.; K.L.S.; and D.A.S.  She argues in one issue that the evidence is factually insufficient to prove that termination of her

---

[1]*See* Tex. R. App. P. 47.4.

parental rights is in the children's best interest. Mother does not challenge the trial court's section 161.001(1) findings. We affirm.

## II. Background

Trial to the court began on June 20, 2011. J.D.S., K.L.S., and D.A.S. were eight, six, and four years old, respectively, at the time. Each of the children's fathers either failed to appear at trial or signed an affidavit relinquishing parental rights, and only Mother has appealed the trial court's judgment.

In September 2007, Mother placed her children into the backseat of a vehicle in which she was a passenger. Mother admittedly failed to restrain the children with seatbelts or child-safety seats, and they were each ejected from the vehicle and injured when the vehicle was involved in a collision. The Department of Family and Protective Services (the Department) removed the children from Mother's care for approximately six months after the accident. Mother later pleaded guilty to one count of child endangerment, and the trial court placed her on community supervision for three years.

The Department received a second referral concerning the children in October 2008, this one alleging drug use, domestic violence, and physical abuse of the children by Mother's then-boyfriend C.G. Mother denied any recent domestic violence or drug use. J.D.S. was interviewed and described hiding a few months earlier with his sisters and seeing adults hitting each other. J.D.S. also talked about wanting to call 9-1-1 but being afraid to do so, saying that he

"would get a whooping." The Department did not remove the children at the time based on insufficient evidence of ongoing domestic violence.

In September 2009, J.D.S.'s school counselor called Mother's house because J.D.S. had missed two or three consecutive days of school. Six-year-old J.D.S. answered the telephone and talked with the counselor for thirty to forty-five minutes, telling her that he had been home alone with his sisters for what the counselor believed was about two hours.[2] The counselor testified that she could hear screaming in the background and that she stayed on the telephone with J.D.S. until the school's liaison officer arrived to check on the children's welfare. In addition, a teacher from J.D.S.'s school testified that she had seen Mother, during the fall of 2009, transport the children after school by car "many times" without safety restraints. Also during the fall of 2009, J.D.S. had twenty-two unexcused absences, nine excused absences, and nineteen late arrivals, and K.L.S. had twenty-six unexcused absences, twelve excused absences, and thirteen late arrivals. J.D.S.'s teacher testified that he was disruptive in class and behind academically, and she said that J.D.S. was depressed and crying at school four out of five days per week.

In January 2010, the Department received another referral involving domestic violence in Mother's home. C.G. pushed Mother, and Mother hit C.G.

---

[2]The counselor had asked J.D.S. about the television shows he had watched while home alone and checked the television show times to calculate the length of time the children were home alone.

3

with a candlestick holder. The children were removed and placed into foster care following this incident. Mother subsequently pleaded guilty to assault causing bodily injury to a family member and was sentenced to forty-five days' incarceration. Because of the new assault conviction, Mother also had pending at the time of trial a motion to adjudicate guilt for the 2007 child endangerment charge, and she faced the possibility of further incarceration.

During the spring of 2011, the Department considered placing the children with Mother's grandmother, A.B., and the Department arranged for the children to have nine visits with A.B. at her home. The Department discontinued the visits, however, because Department personnel believed that A.B. was permitting Mother to visit the children despite repeated instructions to not allow Mother access to the children during the visits. Department caseworker Tyra Sasita testified that the children reported being told to lie to the Department about seeing Mother during the visits.

## III. Discussion

Mother argues that the evidence is factually insufficient to support the trial court's finding that termination is in the children's best interest.

## A. Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp.

4

2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder

5

could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Best Interest Considerations

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). In determining the best interest of the child, the trier of fact in a termination case may use the following factors:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

6

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Application

There is no question that the children love Mother and A.B., are bonded with their family, and want to return home or to live with A.B. Mother notes the children's fear of returning home if C.G. were still there but points to her testimony that she is no longer in a relationship with C.G. The Department counters that the children's fear of C.G. reflects that "[e]ven these small children . . . understood that returning to [Mother's] care might not be in their best interest." In that regard, the children's counselor testified that K.L.S. likes the safety of foster care, that the children spoke of the domestic violence they had witnessed in Mother's home, that the children had bonded with their foster mother, and that the children were not so attached to Mother and their biological family that they could not be successful if Mother's parental rights were terminated. *See In re A.C.H.*, No. 02-11-00072-CV, 2012 WL 1345759, at *12–13 (Tex. App.—Fort Worth Apr. 19, 2012, no pet.) (mem. op.) (affirming best

7

interest finding but noting strong bond between children and parents despite history of domestic violence).

Mother testified that she had not been in an abusive relationship during the eighteen months before trial, and she argues that termination is not proper because she has distanced herself from previous abusive relationships. However, Mother has an almost ten-year history of being in abusive relationships. Both of the childrens' fathers and C.G. physically abused Mother, and Mother pleaded guilty to assaulting C.G. J.D.S. has nightmares about C.G. hitting him and his sisters. Moreover, Mother pleaded guilty to child endangerment following the 2007 car accident in which all three children were ejected from the vehicle, and the trial court heard testimony that Mother was, two years later, still transporting the children by vehicle without proper restraints. Mother also left the children at home alone without adult supervision on at least one occasion; they were alone for at least thirty minutes because the school counselor was on the telephone with J.D.S. for that long before police arrived.

J.D.S. and K.L.S. had excessive absences from school, and J.D.S. has struggled academically. Mother acknowledges that the children had academic and behavioral issues, but she argues that the evidence does not show that termination would address their needs because the children had made only minimal progress in foster care. There is evidence, however, that the children's academic and behavioral problems resulted from living in Mother's home. The children have had extreme temper tantrums, with one such tantrum by D.A.S.

8

lasting a full hour during a parental visitation. The children's behavior was referred to as "Abuse Reactive Behavior," which their counselor described as "a trauma response" seen in "children who have been in an abusive environment, and they act out aggressively. It's a way of when they have felt powerless they want to compensate for those feelings by being aggressive toward other children."

The counselor described J.D.S. as very impulsive, very moody, overly sensitive to criticism, angry, and physically and verbally aggressive. She testified that he has poor social skills, relationship problems with "just about everyone," tantrums, and poor self-management skills, and she said that he bullies his siblings. She also described J.D.S.'s nightmares, saying that he "talks about having dreams of a sex offender ghost." The counselor testified that K.L.S. is also physically and verbally aggressive and moody; that she is disruptive at school, easily distracted, and very disrespectful to adults; and that she has relationship problems and nightmares about people fighting. Four-year-old D.A.S. is similarly physically and verbally aggressive, moody, angry, and defiant, and she cries easily. She also uses foul language and has poor social and relationship skills. There is testimony that the children will require long-term counseling and academic guidance and that they need a caregiver with strong parenting skills. *See In re J.L.B.*, 349 S.W.3d 836, 848–49 (Tex. App.— Texarkana 2011, no pet.) (affirming best interest finding and noting among other things that children's emotional and physical needs would be better served with

9

parents more like their foster mother, that the children needed therapy, and that they had delayed intellectual, social, and emotional development).

Mother has been diagnosed with a bipolar disorder. Dr. Balla testified that although Mother is capable of learning, stress and new situations are difficult for her, and Mother's counselor testified that Mother could benefit from further counseling. Mother argues that counseling would still be available to her if her parental rights are not terminated, and she points to evidence that she can adequately parent the children once her bipolar disorder is stabilized with medication, a process that can take twelve months and that can require continual medication adjustments, and she notes that she did not ask the trial court for immediate custody of the children. Mother also points to evidence that she had completed most of her service plan, that drugs are not a problem for her, and that she had allegedly done reasonably well during her community supervision following her assault conviction. Mother, however, did not show up for her first six individual counseling appointments. She also told the caseworker that she would not work any other services until the Department returned the children to her or gave them to A.B. *See In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, at *6 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.) (noting in best interest review that the mother did not complete psychiatric therapy despite her knowledge that failure to do so could result in termination of her parental rights). The Department also attempted group counseling for Mother, Mother's mother, and A.B. The attempt was unsuccessful, however,

10

because the women insisted that they did not want group therapy, that they already had ways of working through issues in their relationships, and that they did not see the need or potential benefit of therapy. The women attended only one group therapy session.

The trial court also heard testimony that Mother had not shown a willingness to learn and had instead blamed the children for not yet being returned to her. Moreover, Mother interacted appropriately with the children during only about five out of more than twenty visitations, sometimes sleeping and often completely withdrawing from the children. Witnesses reported hearing Mother mock the children for having nightmares and telling them they would never come home if they continued talking to Department personnel. The caseworker testified that Mother and A.B. instructed the children not to tell anyone that Mother had been present at A.B.'s home during visitations in 2011, telling J.D.S. that he would get a "whooping" if he told Department personnel the truth. K.L.S. reportedly told Mother that the Department was watching her, and Mother responded by telling K.L.S. to "shut up." *See Sanders v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-03-00633-CV, 2004 WL 1269335, at *4 (Tex. App.—Austin June 10, 2004, no pet.) (mem. op.) (affirming best interest determination and noting that father did not understand reasons for child's removal, blamed others, and did not avail himself of services offered to regain possession of child).

11

The children's foster mother did not testify at trial, and there is evidence that she had given the Department a thirty-day notice, meaning the Department had to find a new placement for the children. There is no evidence of where the children were subsequently placed, and other than continuing the children in counseling, the Department's plans for the children (such as eventual adoption) were not set forth at trial. Even so, Mother had a pending motion to adjudicate guilt for the 2007 child endangerment charge and faced the possibility of incarceration. In addition, Mother had not located stable housing in the almost eighteen months following the children's removal in February 2010. She testified that she had applied for housing through her MHMR caseworker but that she was on a waiting list, and Mother acknowledged that she did not currently live in a home suitable for the children. Moreover, Mother's income is approximately $500 per month in social security benefits, and she has a $300 per month car payment. *See R.R.*, 294 S.W.3d at 237 (explaining that father's difficulty maintaining safe and stable housing, inconsistent employment history with no guaranteed income, and inappropriate choices that endangered children demonstrated that termination of parental rights was in children's best interest).

Mother's plan is for A.B. to have custody of the children until Mother is able to assume custody. A.B. testified that she wants the children to go to school, church, and college and to be the best persons they can be. The Department argues, however, that Mother's plan is untenable. In that regard, the trial court heard evidence concerning A.B.'s fitness to have custody of the children.

Despite repeated instructions in 2011 that Mother was not to be present or have access to the children during visitations at A.B.'s home, the children reported that Mother attended the visitations. A.B. had also allowed Mother unsupervised access to the children in 2008 against the Department's instructions, and the caseworker testified that A.B. does not see that Mother has engaged in endangering conduct toward the children. Although A.B. testified that she would follow the Department's instructions and any court orders if she had possession of the children, the trial court could have disbelieved her testimony and could have instead believed, based on all the evidence, that A.B. would give the children to Mother or allow Mother improper access to the children if A.B. thought the Department would not know about it.

Moreover, A.B.'s availability for placement is not itself a bar to the termination of Mother's parental rights. As we have stated,

> Reasonable efforts should be made with respect to a child to be placed in foster care to preserve and reunify families and to give preference to an adult relative over a non-related caregiver in determining the placement of a child. *In re C.C.*, No. 02-04-00206-CV, 2005 WL 1244672, at *6 (Tex. App.—Fort Worth May 26, 2005, no pet.) (mem. op.) (citing 42 U.S.C.A. § 671(a)(15)(B), § 671(a)(19) (2003)). However, Appellant provides no authority to suggest that there is either a statutory or a common-law duty imposed on the Department to make such a placement or to investigate such a placement before a party's parental rights may be terminated. The determination of where the child will be placed is a factor in evaluating the child's best interest, but it is not a bar to termination that placement will be with non-relatives. *Id.* at *7; *Rogers v. Dep't of Family and Protective Servs.*, 175 S.W.3d 370, 379 (Tex. App.— Houston [1st Dist.] 2005, pet. dism'd w.o.j.).

*In re K.W.*, No. 02-09-00041-CV, 2010 WL 144394, at *10 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.). Thus, A.B.'s willingness to accept placement is but one consideration in the overall determination of whether termination of Mother's parental rights is in the children's best interest.

Although much of it was contested and conflicting, the trial court heard evidence that Mother personally endangered the children by transporting them in vehicles without safety-restraints; by exposing them to years of domestic violence that led to their nightmares, fears of returning home, and behavioral problems; by failing to ensure their routine and timely attendance at school; and by failing to recognize the risks to which she exposed the children and the need for change. The trial court also heard evidence that A.B. did not recognize the safety risks to the children caused by Mother's acts and omissions or the need for Mother to change and that A.B. repeatedly ignored the Department's admonitions to limit or prevent Mother's access to the children. Based on all the evidence, the trial court could have agreed with the court-appointed special advocate's testimony that termination of Mother's parental rights was in the children's best interests. Thus, after reviewing the entire record and giving due deference to the trial court's findings, we hold that a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship between Mother and the children would be in the children's best interests. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *see also* Tex. Fam. Code Ann. § 161.001(2). We therefore hold that factually sufficient evidence supports

14

the trial court's determination that termination of the parent-child relationship between Mother and the children is in the children's best interests.  We overrule Mother's sole issue.

## IV.  Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment.


ANNE GARDNER
JUSTICE

PANEL:  GARDNER, MEIER, and GABRIEL, JJ.

DELIVERED:  June 14, 2012