

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00019-CV

_____


IN THE INTEREST OF J.L.B. AND J.R.B., CHILDREN


On Appeal from the 307th Judicial District Court
Gregg County, Texas
Trial Court No. 2010-544-DR


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

This is a joint appeal by the mother and father of two children, Samuel and Joshua,[1] of a judgment of the termination of their parental rights to those children. The trial court gave the same three reasons as the bases for terminating each parent's rights. The trial court found that both parents

> knowingly placed or knowingly allowed the [children] to remain in conditions or surroundings which endanger the physical or emotional well-being of the [children];[2]

> engaged in conduct or knowingly placed the [children] with persons who engaged in conduct which endangers the physical or emotional well-being of the [children];[3]

> had [their] parent-child relationship terminated with respect to another child based on a finding that [the parents'] conduct was in violation of § 161.001(1)(D)or (E), Texas Family Code, or substantially equivalent provisions of the law of another state.[4]

The trial court also found that it was in the best interest of the children that the parental relationship be terminated.

We affirm the trial court's judgment of termination.

---

[1]These names are pseudonyms. In a further effort toward privacy, all references to the parents/appellants are made simply as "the mother" and "the father."

[2]*See* TEX. FAM. CODE ANN. § 161.001(D) (West 2011) .

[3]*See* TEX. FAM. CODE ANN. § 161.001(E) (West 2011).

[4]*See* TEX. FAM. CODE ANN. § 161.001(M) (West 2011).

**Sufficiency of the Evidence**

The parents' first point of error asserts that the evidence is legally insufficient to support the findings by the trial court as recited above. The second point of error contends that the evidence is factually insufficient to support those findings.[5]

We begin by summarizing the testimony and evidence admitted at trial, generally grouping the evidence into subjects which were ultimately relevant to the trial court's rulings. We focus on the following areas: the children's past and present circumstances and upbringing, the condition of the family home, the intellectual, emotional, developmental, physical, and educational status of the children, and the mother's and father's past and present status as it affects their ability to parent the children.

**Background and Living Conditions**

Samuel (born in January 2005) and Joshua (born in January 2007) first came to the attention of the Child Protective Services Division of the Texas Department of Family and Protective Services (CPS) when a law enforcement officer stopped a speeding vehicle driven by Russell McCurry, a friend of the boys' parents. Samuel and Joseph were in the back seat of the car and at that time, Joshua was naked and wrapped in a blanket while Samuel was dressed in a

---

[5]These points of appeal, as stated, contain multifarious grounds. Even allowing for the fact that the parents have filed a joint appeal, they are complaining of multiple, distinct bases for termination in each single point of error (one point of error assailing legal sufficiency, one point factual sufficiency). A point of error is multifarious if it embraces more than one specific ground of error. *Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010). Nevertheless, in the interest of justice, we will address the parents' complaints. *See Bell v. Tex. Dep't of Criminal Justice-Inst. Div.*, 962 S.W.2d 156, 157 n.1 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). However, considering that the facts to support some of these claims are very difficult to separate into neat categories and doing so would likely generate a great deal of duplicity, the employment of technically multifarious is acceptable under these circumstances.

3

jumpsuit. The deputy sheriff who stopped the vehicle said Samuel's jumpsuit was "filthy" and the boy had defecated in his pants. Both boys smelled as if neither had been bathed in days. McCurry testified that Joshua was wrapped in the blanket because he had also defecated in his pants, causing McCurry to throw the child's clothes away. At the time of the stop, Samuel was five years old and Joshua was three, but neither was potty trained.[6] Officers took the boys to the police station, where they were cleaned up. CPS representatives went to the parents' home to investigate and the investigation revealed numerous unsafe and filthy conditions, discussed below.

McCurry testified he had taken the boys, with the acquiescence of the parents, to panhandle (i.e., to beg for money) from people in stores and parking lots. Although McCurry equivocated somewhat in his testimony,[7] it was clear that he had used the boys in this kind of money-raising endeavor on previous occasions. McCurry had used the boys in this fashion before to acquire money, both alone and in concert with the parents. Although Detective David Falco initially testified that the father had told Falco he and McCurry used the boys in panhandling, on cross-examination, Falco said that the father was "evasive about the panhandling issue during his

---

[6]On one occasion, in the presence of CPS investigator Kim Clough, Joshua defecated, and proceeded to pick up and play with his feces. The child acted as if this was normal behavior.

[7]McCurry's testimony was not always clear or direct. He acknowledged having been charged with the crime of endangerment of a child, as were both parents. *See* TEX. PENAL CODE ANN. § 22.041 (West 2011). McCurry testified there was some discussion or agreement with the State wherein he would receive some benefit in exchange for his testimony at the termination proceeding. At the motion for new trial hearing, a judgment was admitted showing that pursuant to a plea agreement, McCurry was sentenced to one year of incarceration for endangering a child, stemming from the events at issue in the instant case. McCurry's indictment alleges two counts, each containing two paragraphs. The record is not clear whether the other count was dismissed. In addition, evidence of several other misdemeanor and felony convictions of McCurry were admitted at the new trial hearing.

4

interview" and that concrete information that the boys were used for panhandling came solely from McCurry. The day before the traffic stop, after the boys had been taken to school, the parents and McCurry tended to panhandling, using the proceeds to buy drugs and then "g[e]t high." Later that night, while the parents continued to smoke crack cocaine in their bedroom, they allowed McCurry to take the boys on another panhandling trip,[8] McCurry relating that the father had told him to take the boys and "go make some money." McCurry and the boys were gone for a day or more. At some point, McCurry went to a drug house to purchase crack cocaine, but he said that he was careful not to take the boys into the house with him. Rather, he got a woman (whom he did not know) to come out from the house and sit with the boys while he purchased and smoked his crack cocaine.

Based on testimony from Detective Falco and the deputy who conducted the traffic stop of McCurry, it appears the parents may have reported the children as having been kidnapped. However, since the parents had waited until after the boys had been gone for at least a day before reporting their absence and due to inconsistencies in the story the parents related, the authorities treated their news as a missing persons report and not as a kidnapping.[9]

---

[8]At some point that afternoon or evening, while the parents were in their bedroom using drugs, McCurry said he took the boys outside to play; they had played in grey discharge water, possibly sewage, and McCurry took them into the bathroom to clean them (though apparently not very thoroughly).

[9]For example, the parents apparently told the officers they had become ill from eating something, which led them to fall asleep and thus not realize the boys were gone. The parents later acknowledged smoking crack cocaine the night before making the police report. The parents did not testify, and the chronology of events is gleaned from the testimony of the law enforcement officers and McCurry.

The State presented several witnesses who had visited the family home and testified as to its condition. The State's contact with the home began on or around the day the children were found in McCurry's charge. In general, the testimony and pictures admitted into evidence described a dwelling which could be described most charitably as a cluttered mess and, more realistically, as an unsanitary, unsafe fire hazard. (As if confirming the observations about the unsafe condition of the house, it burned to the ground within a few months after the boys' removal by CPS.)

Several witnesses testified to an unpleasant odor coming from the family's home. Specifically, Verdell Burton[10] described the smell as a "foul odor" from urine and testified that on one of her visits to the home, she observed dog urine on the floor. When she discussed the presence of the undisturbed dog urine, the parents acted as if such a condition was normal and made no attempt to clean it from the floor.

CPS investigator Clough likewise described a "very foul odor" emanating from the house.[11] Clough had first gone to the family home after the boys had been discovered in McCurry's automobile, the purpose of her visit being to investigate the conditions at the home and to make contact with the boys' parents. Clough was present at the house when the police brought

[10]Burton was an employee of Family Focus Center. Burton said the agency's "protective homemaker services consist of modeling, teaching of home management, child care skills, locating access and resources for children and families in their own homes as part of an ongoing case plan."

[11]Detective Falco described the smell as a "horrible odor," a "rank, unclean odor of day-old grease or days-old grease. . . . just a really bad odor." He experienced this scent despite never going completely in the house. Mary Beth Gaddy, one of the boys' teachers, on one occasion visited the home and noticed a "sour" odor from the house; the parents, she said, always spoke to her on the porch.

the boys home after having been removed from McCurry's automobile. At that time, the boys were still wrapped in blankets because the police had washed the boys' clothes and they were not yet dry. Although the parents were not at the house when Clough arrived, she was met by the boys' paternal grandmother, who also lived in the house. After Clough asked the grandmother, who had significant vision problems, to locate clothing for the boys, the grandmother took a pair of shorts and a T-shirt (neither of which was clean) from one of many piles of clothes in the house, handing the shorts to Samuel and the T-shirt to Joshua. Samuel donned the shorts, sans any underwear, and Joshua put on the T-shirt, backwards. Clough considered the clothing inappropriate because although it was warm in the house, the outside temperature was quite cool. She was also concerned about sharp, torn edges of the linoleum floor which pointed up, and spider webs on windows.

When Clough asked the grandmother about the smell which permeated the house, the grandmother responded that "the house needed to be tidied up a bit." Clough found this to be something of a monumental understatement, observing piles of trash and clothes throughout the house,[12] "old food, soiled pots" on the kitchen table, and "pots on the floors of the kitchen with old food in them." Clough said although the chairs around the kitchen table were all broken, their condition did not prevent Joshua from climbing up the chairs onto the cabinets "as if he were playing a game." Despite the fact that the kitchen sink was full of dirty dishes, it did not appear to be functional because "it was broken and actually leaning to the side." Clough discovered that the

[12]At least one of the clothing piles reached to the ceiling.

7

refrigerator contained rodent droppings, but no edible food.[13]   Her description of the area

continued:

> There were tons of pots, old food, there was trash underneath the refrigerator.   And
> when I refer to trash, it is actually a combination of clothing, paper goods, metal
> goods, forks and spoons, just appeared to be a kind of a catch all.

Clough was also concerned to find one of the burners on the stove was lit and burning.   Clough

feared the children, with their access to the kitchen, could burn themselves.   The stove's knobs

were all removed, and the grandmother explained a "special tool" was needed to turn off the stove,

which was kept burning to assist in heating the house.   Clothing and paper were packed beneath

the stove, where a broiler or storage drawer was usually located; Clough considered this to be a fire

hazard.   Clough was concerned by the high number of electrical appliances and their cords, and

she observed the boys playing with electrical outlets.   Throughout the house Clough saw space

heaters situated dangerously close to piles of clothes, which Clough said were fire hazards.

B. J. Owens, city code enforcement officer for the City of Kilgore, testified that he had

made several investigations of the house since 2005, issuing thirteen or fourteen citations for

hazardous conditions (e.g., various junk and debris on the exterior and problems with rodent and

mosquito harborage on the premises).   He observed that in May 2010, the house had no running

---

[13]McCurry, the family friend with whom the boys were initially found, said that on the Friday night before he eventually took the boys to panhandle and was stopped by police, there was nothing but pancake mix in the house, so he went to a store and purchased chicken wings for the family.

water.[14]  At some point, the house was formally condemned.  Owens said he was not surprised that the house had burned, as he had seen several fire hazards in his inspections and said,

> Well, during an inspection, I walk in, there's piles of trash with propane heaters sitting beside them, candles sitting beside them.  Some of the photographs[15] show extension cords running over -- running over paper and trash, and it's just -- it's like I had told [the mother], you know, it's dangerous to have that kind of open flame -- Coleman lanterns laying on top of a dresser that has piles of clothes and trash that's piled up on there, dogs running around the house with extension cords pulled out everywhere.  So there were plenty of things that would kind of give you pause or give me pause and say, "Look, you need to clean this up.  You need to clean this up."

Although Owens stated the appellants had made some repairs and done some cleaning, he did not believe the home was safe for a family.  Clough also said she did not feel the children were safe in the home, which led to her decision to remove them to CPS custody.

At the time of the trial, the parents had relocated to a different house, a different one from the one they had inhabited at the time of the boys' removal.  CPS investigator Natalie Wash visited this second home and, after observing it, still harbored a number of concerns.  In the more recent abode, the dogs seemed "dirty" and there was a fish tank which did not seem clean.  There was a plate of dog food on a table next to the couch which would have been in reach of children; Wash observed cords hanging off a cabinet which held figurines.  Wash was concerned that in her visits to this more recent home over the course of a few months, the amount of clutter consistently

---

[14]Another witness testified that at times the house also had no active electrical service.

[15]Although many photographs were admitted to evidence during trial, none were sponsored by or authenticated by Owens.

increased with the duration of the parents' occupancy. The house did not exhibit what Wash would consider "minimum standards of being clean." An animal control officer testified that he found several pieces of "hours old" dog feces in the grandmother's bedroom and a shed where puppies were being kept had a "pretty bad situation of feces." The officer testified the conditions were unsanitary.

**Condition of the Children**

Mary Beth Gaddy, a special education teacher, taught Joshua for about two months before CPS became involved and the children were removed from the appellants' home. Gaddy said that Joshua was "basically nonverbal . . . . No use of language, he produced syllables."[16] As for Samuel, she said she could understand him because she was accustomed to listening to "unintelligibles" and could generally discern what children were saying. She did opine that both boys were in need of speech therapy. When CPS removed the boys from the home, both children suffered from significant speech difficulties. CPS caseworker Wash testified that since the removal from the home, the boys were each receiving speech therapy two hours per week. She described both boys as being "[i]ncoherent," relating that, for example, the boys were unable to have a "conversation where somebody could easily understand what they were saying to get their point across." The speech therapy included some which was received in school and additional therapy outside of school; Wash said that the boys would require long-term speech therapy and

---

[16]Initially, it appeared this statement was made about Samuel; but after a clarification, it appears that she was describing Joshua, the only one of the boys with whom she specifically worked. Gaddy said she only observed Samuel, the older boy, in his regular classroom, and he was not Gaddy's student.

that Joshua had been diagnosed as "probable Aspergers and mental retardation." Wash testified that the boys were responding quite well to the structure and consistent attention they were receiving in foster care.

Gaddy evaluated Joshua about a month before his third birthday, finding his development to be well below normal. Although the child was almost 36 months of age, Joshua's cognitive skills were in the normal range of a child aged 6 to 16 months old, language skills in the 6- to 17-month range, gross motor skills in the 11- to 27-month range, fine motor skills within the 16- to 32-month range, the self-care skills within the 10- to 15-month range, and social skills within the 5- to 14-month range. Gaddy was also very concerned with Joshua's appearance because he smelled bad and was consistently unclean, sometimes with dried food on his clothes. She worried about this not only for hygienic reasons, but because she feared that other children would tease or ostracize him, further impeding his personal development. Gaddy visited the family home, once even providing soap, towels, and detergent and talking with the mother about her responsibility to clean the boys. Although Gaddy only taught Joshua about two months and her delivery of the cleaning items occurred about a month into her contact with the boy and his family, she described the difference in cleanliness after her delivery as "[m]inimal."

Psychologist Donald Winstead evaluated Samuel. Winstead found the boy's intelligence quotient (IQ) to be in the "mentally deficient range." Samuel exhibited developmental delays in academic achievement scores, in emotional problems, and in his difficulties relating to and dealing

11

with other people.    Winstead recommended involvement in extracurricular activities, occupational therapy, and active family involvement.    Winstead's written evaluation made the following observations:

> There was a significant difference between his verbal and nonverbal abilities in a pattern often seen with children who have been raised in an abusive, neglectful and/or chaotic caregiving environment.    His overall ability to function in school was rated as very poor.    He has notable attention and concentration deficits.
>
> . . . .
>
> . . . . The overall quality of his family relationships was rated as below average. His self-esteem was rated as very poor.    His ability to express affection toward and accept affection from others was rated as below average.
>
> . . . .
>
> [Samuel] does not have a history of behavioral problems.    However, his overall ability to control his behavior in social situations was rated as poor.    He is described as hyperactive and impulsive.    He exhibits negative-contrary behavior.

Both children were experiencing developmental delays in their intellectual progress.    Joshua, the younger boy, was diagnosed with "a pervasive development disorder."

The foster mother with whom the boys were placed testified the boys were evidently not experienced in either bathing or brushing their teeth.    In her first attempt at bathing the children, it took two hours for her to coax the boys to the bathtub and calm them enough to be cleaned.    The dental care of the boys was apparently nonexistent.    Samuel had nine cavities in his teeth, while Joshua had eight; both boys' teeth were covered with plaque.    CPS caseworker Wash related that at least one of the children required some degree of dental surgery, including having caps installed.

Samuel required having some teeth removed and a spacer installed. Wash testified that on her initial evaluation, she observed that the boys were very thin and when food was placed before them or they "saw food anywhere in the room wherever they were, they would immediately run to the food and shove it in their mouth[s] as quickly as they could."

Even after about five weeks after the boys were removed from their parents' care, both boys tested positive for cocaine in their systems. Cindy Beck, a chemical dependency counselor, said it was possible that if cocaine residue was on a surface in the home, a small child of the age of three to five could touch that residue, put his fingers in his mouth, and thereby ingest the cocaine into his system.

**The Parents**

Psychologist Winstead evaluated the parents and described both of them as having cognitive functioning in the "borderline range of intelligence." At this mental level, such persons "are capable of normal functioning, they have a job, drive a car, raise kids, those types of things." Winstead diagnosed the mother as suffering from post-traumatic stress disorder (PTSD) stemming from her abusive and neglected childhood. She acknowledged to Winstead she had been neglected and physically and sexually abused[17] as a child, and Winstead opined that people with

---

[17]The mother told therapist Donna Mason, a licensed professional counselor, that her brother had sexually assaulted her for years when she was a child. Mason said that the mother also related that her brother had also sexually assaulted one of the mother's children, but no details of this abuse were provided. Winstead also said he received a report from the boys' foster parent that one of the boys may have been sexually assaulted. Mason was very concerned at the lack of judgment that the mother displayed when—despite this history of sexual abuse—the mother moved, apparently with the boys, next door to the brother.

such a history are at increased risk of visiting this same kind of mistreatment upon their own children. He found her to suffer from attachment disorder, a condition which prevented her from regulating her own emotions and being able to properly attach or relate to children. Winstead held the opinion that the PTSD from which she suffered could prevent the mother from dealing with her own anger or depressive feelings, a circumstance which could then cause traumatic instances with children. Winstead made the following recommendation of treatment for the mother:

> Without long-term, intensive psychotherapy, there was a significant probability that [the mother] would not be able to effectively care for her children on a consistent basis.

Winstead recommended two to five years of at least weekly counseling for the mother. In his written evaluation, Winstead stated the mother possesses characteristics of persons known to abuse children.

Winstead also evaluated the father and found evidence that the father had been abused as a child. Winstead again posited that such a history could lead to the father to have the potential to be abusive to children, although he also acknowledged that there was no evidence of any abuse on the father's part. The father exhibited traits of low level depression and schizoaffective symptoms, such as delusional thinking, something consistent with reports that the father had claimed to see and hear spirits. Winstead's written evaluation noted that the father has auditory

14

hallucinations and believed that he has seen ghosts in his house.[18]   A pertinent observation in the written report is the following:

> [The father] is likely to be threatened by a child's normal strivings for a sense of power and independence and likely views a child who expresses a view/opinion that is different from that of his parent's view as a form of disrespect.  He may expect children to be strictly obedient and may be easily threatened when his parenting is questioned.  [The father] is not likely to value negotiation and compromise as a means of solving problems between a parent and a child.
>
> [The father] has significant *problems with his children*.   He is likely to describe his children in a negative manner. . . . Overall, he is likely to perceive that his children have limited ability and / or competency.

Also noteworthy in the conclusion of the written evaluation is that Winstead observed that the father displayed symptoms of "Avoidant, Borderline, Dependent, Paranoid, Schizoid, and Schizotypal Personality traits with depressive, sadistic, passive aggressive and self-defeating features."

Mason also saw and evaluated the parents.  Mason testified she did not think the boys were safe in the parents' home and did not believe the parents could protect the boys from further abuse or harm.   When asked if there was anything that could make the placement with the parents safe for either the boys or for any other children, Mason said she had no "recommendations that would fulfill [that] request."

---

[18]Mason said that based on her interviews with father and mother, she was "confident," the parents were not joking about the ghost—that both believed they saw and heard ghosts in the home.   Mason was concerned that the boys too evidently saw and spoke to the spirits.

Winstead said both parents would need to "work through" their respective psychological and emotional issues "before they would be ready to provide some consistent parenting." Mason said she believed that both parents would require five to eight years of weekly counseling to be able to care for their children.

Both appellants admitted to CPS investigator Clough they were active users of cocaine and that on the Friday before the boys were found with McCurry, they had purchased and used drugs with McCurry. The parents similarly admitted to Detective Falco having used crack cocaine the day before they reported the boys as missing. Clough said that on or about March 15, 2010, both parents tested positive for cocaine use, this date being about a week after the boys were found with McCurry.[19] McCurry, as mentioned above, testified to frequent use of illegal drugs by the parents.

In her defense, the mother presented a chemical dependency counselor as a witness in her behalf who said that the mother seemed to have made progress in avoiding illicit drugs and that continued avoidance of those drugs would improve her parenting ability. There was also testimony that the parents had made some repairs to the home and had attended some parenting classes. Wash said they actually completed a service plan established by CPS, and psychologist Winstead said they attended parenting classes conducted by him. However, counselor Mason

---

[19]Another CPS investigator testified that although the parents were each ordered to make child support payments following CPS's removal of the children from the home, totaling about $417.00 a month, they had paid no support and spent about that much each month on cigarettes.

16

testified that although the father attended more than half of the assigned parenting classes which she conducted, he was "eliminated" from the class for failing to attend the required number.

**Standard of Review**

We now turn to the question of whether the requisite clear and convincing evidence established sufficient proof of the alleged grounds for termination of the appellants' parental rights. TEX. FAM. CODE ANN. § 161.001 (West 2010); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *J.O.A.*, 283 S.W.3d at 344.

When legal sufficiency of evidence supporting termination of parental rights is challenged, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *Id.* at 344–45 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In this bench trial, we assume that the trial court resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, but disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *J.F.C*, 96 S.W.3d at 266.

In reviewing for factual sufficiency, we give due consideration to evidence the court could reasonably have found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). We are to determine whether the evidence is such that a fact-finder could reasonably form a firm

17

belief or conviction about the truth of the allegations. *Id.* at 25. A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## Sufficient Evidence Supports Two Findings as Grounds for Termination

There was ample evidence to support the finding that the parents knowingly placed or knowingly allowed the children to remain in surroundings that endangered the children's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(D). As stated above, several witnesses testified that the house was not safe for the boys and a psychologist who examined both parents said neither was capable of safely caring for the boys. There was testimony regarding the unsanitary and unsafe living conditions (e.g., trash throughout the house and yard, piles of trash and clothes were dangerously close to open flames or space heaters throughout the house, a distinct foul odor throughout the house caused by unclean conditions, an odor often attributed to urine—deposited both by dogs[20] and, perhaps by the boys—which none of the occupants seemed compelled to clean up). Viewed in the light most favorable to the trial court's ruling, we find a reasonable trier of fact could have formed a firm belief or conviction the parents knowingly placed

---

[20]As regards the evidence of dogs defecating in the house, it appears the only evidence of that was in the second house, i.e., the one where the parents were living at the time of trial and where the boys had not lived.

18

or knowingly allowed the boys to remain in conditions or surroundings that endangered the boys' physical or emotional well-being. The evidence is legally sufficient to support a finding of termination under Section 161.001(D). TEX. FAM. CODE ANN. § 161.001(D); *see also In re C.L.C.*, 119 S.W.3d 382, 388–89, 393–94 (Tex. App.—Tyler 2003, no pet.) (admitted drug problem and drug use, and unsafe, unsanitary conditions in house and yard among other conditions deemed to endanger children's well-being); *Jones v. Dallas County Child Welfare Unit*, 761 S.W.2d 103, 105–06 (Tex. App.—Dallas 1988, pet. denied) (school-age child "soiling himself two to three times a day"; "malodorous living conditions"; piles of garbage and dirty clothes; house smelled of mold and urine; sufficiently supported termination based on children being allowed to remain in conditions or surroundings, or parents engaging in conduct which endangers children's physical or emotional well-being).

Likewise, the evidence was factually sufficient. In reviewing factual sufficiency, we consider all of the evidence reviewed under a legal sufficiency review, and give due consideration to evidence the fact-finder could reasonably have found to be clear and convincing. *In re J.F.C*, 96 S.W.3d at 266 (citing *In re C.H.*, 89 S.W.3d at 25). Beck, a chemical dependency counselor, testified that she had worked with the mother, who had curtailed her drug use. There was testimony the parents had effected some repairs to the first home before it burned. There was evidence the parents participated in, and completed, some service plans and parenting classes designed or assigned by the State's agency. Conceivably, this is evidence that disputes the State's

19

evidence that discounts the parents' ability to carry out the duties of parents. Nonetheless, giving due deference to the trial court's factual determination, we find the state of the evidence sufficient that the fact-finder could reasonably form a firm belief or conviction the parents knowingly placed or knowingly allowed the boys to remain in conditions or surroundings that endangered the boys' physical or emotional well-being.

There was also clear and convincing evidence that the parents engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(E).

A great deal of the evidence cited above also supports termination on this ground. The parents' frequent use of illegal drugs (including exposure to the extent that the boys actually tested positive for cocaine), their neglect of the children as evidenced by the boys' lack of cleanliness or personal hygiene and unfortunate dental conditions, the use of the boys to panhandle, and allowing another frequent drug user, McCurry, to take the children on panhandling trips (where one such trip included a stop at a drug house, where the boys were left in the care of an unidentified woman while McCurry purchased and ingested drugs), all constitute knowing conduct that endangered the physical and emotional well-being of the children and knowingly placing the children with persons who engaged in conduct which endangered the boys' physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(E); *see also J.O.A.*, 283 S.W.3d at 345 ("parent's use of narcotics and

its effect on his or her ability to parent may qualify as an endangering course of conduct"). The evidence is legally sufficient to support the trial court's finding on this termination ground.

The evidence is also factually sufficient to support termination on this allegation. Even with the chemical dependency counselor's testimony that the mother had curtailed or ceased her use of illegal drugs, substantial damage had already been done: there was evidence of regular drug use by both parents prior to CPS's involvement in this case. The trial court could reasonably deduce that such drug use had been present throughout the children's lives and that without the agency's intervention, the drug abuse would have continued. The same could be said of the use or involvement of the boys in panhandling, even if the fact-finder were to consider they had only been present and not actually used to solicit donations. As for the parents' statements to law enforcement that they did not give McCurry permission to take the boys on the night or in the hours before they were found, the trial court, as fact-finder, judged the credibility of witnesses and resolved any conflicts in testimony. *See In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied). "[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct." *In re N.S.G.*, 235 S.W.3d 358, 367–68 (Tex. App.—Texarkana 2007, no pet.).

**Best Interests of Children**

There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome the presumption. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In deciding whether termination would be in the best interest of the child, the trial court may consider this nonexclusive list of factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re K.W.*, 335 S.W.3d 767, 770 (Tex. App.—Texarkana 2011, no pet.). Also, evidence offered to prove grounds for termination is relevant to determining if the termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 28; *In re J.W.M.*, 153 S.W.3d 541, 548–49 (Tex. App.—Amarillo 2004, pet. denied) ("While the prospect of adoption into a stable home cannot alone be said to be a determinative factor, it clearly is among the factors the court properly could consider . . . ."). It is unnecessary to prove all of these factors as a condition precedent to parental termination. *C.H.*, 89 S.W.3d at 27.

22

There are several evidentiary items discussed above which point to termination being in the boys' best interests. The emotional and physical needs of the children now and in the future would be better served by being with parents more like the foster mother, with whom the boys lived during trial, than with their biological parents. The foster mother described the deteriorated condition of both boys' teeth when they came under her care and their reticence concerning hygiene. Both boys also need speech therapy and exhibited signs of developmental delay in their intellectual, social, and emotional development. The parents' demonstrated poor judgment, the constancy of their drug use, their association with McCurry and their having allowed the boys to participate with him in panhandling, and the deplorable condition of the home when CPS first became involved all cut against the parents. CPS caseworkers said the boys needed specialized foster care and were responding very well to the foster care they were receiving at the time of trial. Several of the *Holley* factors, when applied to the facts of the instant case, point to the children's best interests being served by termination of the parents' parental rights.

We consider the evidence sufficient to support a finding by a clear and convincing evidence standard that the best interests of the children support termination of the parent/child relationship.

**Review of Out-of-State Termination Not Necessary**

As an additional basis for termination, the State also alleged (and the trial court found) that the appellants' parental rights to another child had been previously terminated in West Virginia for

conduct substantially equivalent to Section 161.001(1)(D) or (E) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(M). The appellants complain in their third and fourth points of error there is nothing in the record establishing that the applicable laws in West Virginia provide for the right to trial by jury in termination proceedings and that the State failed to give appellants adequate notice of this alleged ground for termination.

We need not address these complaints, as we have found sufficient evidence to support termination based on Section 161.001(D) and (E) of the Texas Family Code. Sufficient proof of one statutory termination ground, in tandem with the finding that termination is in the best interests of the children, is sufficient to support a termination order. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769.

We affirm the judgment of the trial court.


Bailey C. Moseley
Justice

Date Submitted:     August 10, 2011
Date Decided:       September 2, 2011


24