

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00050-CV

_____

IN THE INTEREST OF A.L. AND D.L., CHILDREN

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 78,826

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Twenty-four-year-old Brandy Lee had been addicted to methamphetamine for many years and had continued to make bad choices when the trial court terminated her parental rights to A.L. and D.L.[1]  Lee appeals the termination claiming that insufficient evidence supports the trial court's judgment.  We affirm the trial court's judgment.

Specifically, Lee argues that the evidence was legally and factually insufficient to support the trial court's findings (1) that she "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child[ren]," (2) that she "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child[ren]," and (3) that she "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of the child[ren]." *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (West 2014).  Lee also challenges the trial court's finding that termination of her parental rights was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(2) (West 2014).

According to Lee's grandmother, Norma DeMont, Lee had no schooling beyond the tenth grade, had held only one job for as much as three months at a time, and had never proven that she was capable of supporting herself.  By the time of trial in this case, Lee's first child was

---

[1]To protect the confidentiality of the children, A.L. and D.L., this Court will refer to relatives of involved individuals by fictitious names. *See* TEX. R. APP. P. 9.8(b)(C)(2).

living with her father, and Lee was pregnant with her fourth child.[2]  After receiving reports that Lee was using methamphetamine in front of the children, had sex in front of the children, and was "passing out naked pictures with call back numbers, for possible prostitution," the Texas Department of Family and Protective Services intervened.  Realizing that its efforts to assist Lee were failing, the Department filed suit to terminate Lee's parent-child relationship with her second and third children, the then four-year-old A.L. and one-year-old D.L.

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  Decisions from Texas courts show great respect for the biological bond between parent and child, recognizing "that the natural right which exists between parents and their children is one of constitutional dimensions."  *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994); *In re J.J. & K.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied).  Thus, we strictly scrutinize termination proceedings in favor of the parent.  *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied).  On the other hand, the child's emotional and physical interests must not be sacrificed merely to preserve parental rights.  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

To terminate an individual's parental rights to his child, the Department must prove, and the trial court must find, by clear and convincing evidence, both (1) that the parent has engaged in one of the statutory grounds for termination and (2) that termination is in the child's best

---

[2]There was evidence that none of Lee's four children shared the same father.

interest. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012); *C.H.*, 89 S.W.3d at 23. Proof by clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *C.H.*, 89 S.W.3d at 23. Due process demands this heightened standard. *E.N.C.*, 384 S.W.3d at 802 (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). Thus, in reviewing termination findings, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *C.H.*, 89 S.W.3d at 25.

In a legal-sufficiency review, termination findings are given appropriate deference. *See J.F.C.*, 96 S.W.3d at 266; *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 679 (Tex. App.—Austin 2005, no pet.). In such cases, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume that the fact-finder resolved disputed facts in favor of the finding if a reasonable fact-finder could do so and disregard evidence that the fact-finder may have reasonably disbelieved and witnesses whose credibility may reasonably be doubted. *E.N.C.*, 384 S.W.3d at 802 (citing *J.F.C.*, 96 S.W.3d at 266); *J.P.B.*, 180 S.W.3d at 573.

The inquiry in a factual-sufficiency review is "whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations." *C.H.*, 89 S.W.3d at 25; *J.L.B.*, 349 S.W.3d at 846. We consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *C.H.*, 89 S.W.3d at 28; *J.L.B.*, 349 S.W.3d at 846. If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that the State's allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *C.H.*, 89 S.W.3d at 18–19; *see J.F.C.*, 96 S.W.3d at 266.

Lee's criminal history preceded the Department's involvement in this termination case. Nora Granger, a Kaufman County community supervision officer (CSO), testified that Lee was placed on deferred adjudication community supervision on June 2, 2011, for a state-jail felony theft offense. The terms and conditions of Lee's community supervision required her to remain drug free, report to her CSO periodically, complete community service hours at a specified rate, and pay community supervision fines and fees as ordered. According to Granger, the State filed a motion to revoke November 28, 2011, because Lee had failed to report to her CSO, had not completed the required community supervision hours, and had not paid the required fines and fees. One month later, on December 13, 2011, when A.L. was two years old, Lee tested positive for methamphetamine. The State's motion to revoke was pending when Lee moved to Hunt County, Texas.

5

D.L. was born August 29, 2012. On October 17, 2012, the Department received reports that Lee and her sister, Amy Lee, were using methamphetamine in front of the children, were having sex in the children's presence, and were "passing out naked pictures with call back numbers, for possible prostitution." Jessica Francis, an investigator with the Hunt County Child Protective Services (CPS), discussed the allegations with Lee. Despite the prohibitions stated in the terms and conditions of her Kaufman County community supervision, Lee admitted to Francis that she had recently used methamphetamine at a friend's house, that she had regularly abused the drug for approximately five years, and that she typically used the drug with Amy, who also had a young child.

Based on Lee's interview with Francis, the Department developed an initial safety plan, signed by Lee October 25, 2012, that (1) removed A.L. and D.L. from Lee's residence and placed them with Lee's mother, Angie Lee, and DeMont, who lived next door,[3] (2) prohibited any unsupervised visitation by Lee or Amy, and (3) required Lee to refrain from using illegal substances. However, on November 1, 2012, Lee testified positive for methamphetamine and, according to Francis, admitted to using the synthetic, marijuana-like drug K2 and taking Hydrocodone that was not prescribed to her.

On November 8, 2012, Francis made an unsupervised visit to the residences and was expressly denied entry by DeMont. On November 14, 2012, Francis testified that, although she could hear people inside, no one opened the door to her. The following day, Angie granted Francis entry to Lee's trailer. Francis found the children inside with Lee, Amy, and two

---

[3]The two residences sat on the same lot. At the time of the Department's intervention, A.L.'s and D.L.'s fathers were both incarcerated.

unknown males. Francis testified that Lee would not keep contact with her and that neither Lee nor her family members were following the initial service plan. Francis' supervisor, Rochell Bryant, travelled to the trailers November 20, 2012, to investigate a new report that Angie and DeMont were allowing Lee and Amy, "who were having a drug problem," to have unsupervised visitation with the children. Bryant testified that DeMont met her outside of the trailers and was very angry that she was there. DeMont told Bryant that Lee and Amy were no longer living in the trailers. Although the trailers were cluttered and the children were sick and dirty, Bryant testified, "for the most part [the children] were okay."

As a result of Lee's noncompliance with the initial safety plan, the Department (1) issued a new safety plan November 26, 2012, which prevented Lee from having any contact with her children, and, (2) on November 30, 2012, filed suit for protection of the children, temporary managing conservatorship, and termination of Lee's parental rights in the event that reunification could not be achieved.

On December 12, 2012, after she was found hiding in DeMont's trailer, Lee was arrested on a warrant that had been issued on the State's motion to revoke her Kaufman County community supervision. While her children watched, Lee was taken into custody by Michael Ball, a Hunt County police officer. As a result of the State's motion, a Kaufman County court adjudicated Lee's guilt, but continued her on community supervision and extended the period of her community supervision by one year. Although Lee was continued on community supervision, the incident confirmed to the Department that Lee and her family were not complying with its safety plan.

On January 2, 2013, the trial court issued temporary orders which (1) appointed the Department temporary managing conservator of A.L. and D.L., (2) allowed the children to be placed into foster care, (3) appointed Lee temporary possessory conservator of the children, and (4) set forth the tasks Lee was required to accomplish to ensure the return of her children. The order required Lee to (1) attend counseling until the counselor determined that no further sessions were necessary, (2) successfully complete parenting classes, (3) submit to a drug and alcohol dependency assessment as determined by the Department, (4) follow all recommendations of the drug assessment, (5) submit to random drug testing, (6) refrain from drug or alcohol use during the pendency of the case, (7) maintain stable income throughout the pendency of the case, (8) maintain stable, safe, and appropriate housing, (9) refrain from engaging in criminal activity, (10) refrain from unsupervised visitation with any children under eighteen years of age, and (11) comply with each requirement set out in any service plan created by the Department during the case.

On January 17, 2013, the Department issued a new family service plan incorporating the trial court's temporary orders. The Department's plan included all of the trial court's requirements for Lee and also specified that she (1) obtain and maintain steady employment or provide CPS with a list of every job applied for, (2) attend scheduled supervised visitation with the children, (3) attend and participate in individual counseling with Ray Gladden, beginning within thirty days and continuing until release by Gladden, (4) complete a drug and alcohol dependency assessment with Lakes Regional MHMR Center in Greenville, Texas, and follow all recommendations from that assessment, (5) attend, participate in, and successfully complete six

8

sessions of parenting classes at Raffa Clinic in Greenville, (6) attend, participate in, and successfully complete outpatient drug treatment and classes, and (7) attend Narcotics Anonymous/Alcoholics Anonymous meetings three times a week. Department employee Morgan Shields testified that she met with Lee to review this plan in person and to explain to Lee what she needed to do in order to gain the return of A.L. and D.L. On February 7, 2013, Shields met with Lee, Angie, and DeMont. At this meeting, the Department provided Lee with a calendar to assist her in planning her services. The calendar contained notations on dates when Lee was expected to receive services, as well as telephone numbers for the people Lee was expected to call. According to Shields, Lee was less focused on obtaining the return of her children and was instead more concerned with having an intimate relationship with Sean Lymes, A.L.'s father, who was still incarcerated.

At a February 8, 2013, status hearing, the trial court (1) reviewed the Department's plan, (2) found the Department's plan to be reasonable and in compliance with its temporary orders, (3) further found that Lee understood the plan, and (4) incorporated the Department's January 17, 2013, family service plan as an order of the court.[4]

Shields testified that Lee passed drug tests administered in January and March 2013. CSO Granger also testified that Lee passed a March 20, 2013, drug test. However, Lee was still socializing with drug users and engaging in risky behavior. According to her own testimony,

---

[4]Sometime in February, DeMont's trailer burned, and she moved to an apartment complex in Greenville. Granger testified that her February 6 and March 10, 2013, field visits to the trailers revealed that Lee and Amy were living together in the remaining trailer.

Lee went to her drug-user friend Rosalinda Chapman's house to meet a man named Rick.[5] During this initial introduction, Lee had sex with Rick and became pregnant. When Lee informed Rick of the pregnancy, Rick told Lee that he wanted nothing to do with her and promptly changed his telephone number. According to Lee, Chapman "never said that [Rick] was a good guy."

During this timeframe, Granger testified that Lee, who was supposed to be reporting to the community supervision office twice a month, was "barely making one appointment a month." Lee had not performed her community service as ordered and was behind on her community supervision fines and fees. Granger testified that Lee, though pregnant, refused to submit to a drug test June 19, 2013. Lymes was released from incarceration June 23, 2013. In July, August, and September, Granger called Lee several times and asked her to come in for drug testing. Lee did not comply. Consequently, (1) the State filed another motion to revoke Lee's community supervision, (2) Lee was arrested and incarcerated for twenty days, and (3) on October 29, 2013, the Kaufman County court again extended Lee's community supervision by another year. Even after the October order, Granger testified that Lee was still not complying with the terms and conditions of her community supervision. On November 15, 2013, a few days before the final hearing in this termination suit, Lee told Granger that she desired to serve time in jail rather than satisfy the terms and conditions of her community supervision.

At trial, the evidence demonstrated that Lee was not abiding by the terms of the Department's family service plan. Collectively, Shields and Heather Barnes Ponder, a

---

[5]Lee never knew Rick's last name.

10

Department social worker, testified that, while Lee completed a substance abuse evaluation, counseling, attended all but one parenting class, and sporadically attended Narcotics Anonymous meetings, she (1) failed to follow up on the drug evaluation's recommendation that she complete inpatient treatment in a rehabilitation center, (2) never attended outpatient drug treatment or drug classes although (a) she had qualified for assistance to pay for those resources, and (b) DeMont had previously volunteered to pay for the treatment, (3) never found employment, (4) failed to maintain stable, safe housing, and (5) missed nine scheduled visits with A.L. and D.L. since April 2013. According to Ponder, Lee's missed visitation created much anxiety in A.L.

Lee testified in her own defense, claiming that she had not refused Granger's urinalysis. Lee explained that she was unable to use the restroom and that DeMont, who had transported Lee to the appointment, became impatient and decided not to wait until the test could be completed. DeMont denied Lee's account and testified that she would have waited for Lee to complete the drug test. DeMont also testified that she drove Lee to visit the children, had not known that Lee had missed nine scheduled visitations, and would have driven Lee to those visits had she been asked to do so. Lee claimed that she had completed parenting classes, but did not have any documentation confirming her successful completion of all classes. According to Lee, she was unable to obtain employment because she was pregnant. Lee admitted that she did not complete inpatient treatment.

Claudia Fulbright, a Court-Appointed Special Advocate, testified that A.L. and D.L. had been in a foster home for two months, were bonded with their foster family, and were thriving. According to Fulbright, the foster family was capable of meeting A.L.'s and D.L.'s physical and

emotional needs and was "[a]bsolutely" interested in adopting them. Fulbright testified that A.L. and D.L. would be in danger if returned to Lee and that termination was in the best interests of the children. The associate judge agreed and ordered that Lee's parental rights to A.L. and D.L. be terminated.

On November 20, 2013, Lee filed a request for a de novo hearing, which was held June 3, 2014. At the hearing, Lee testified (1) that she had passed two drug tests given by the Department, (2) that she was waiting to hear whether Albertson's grocery was willing to hire her pending the results of another drug test, (3) that she had worked at a Golden Chick fast food restaurant before applying for a job at Albertson's, (4) that it had been over one year since she last used methamphetamine, (5) that her fourth child's father might have been D.L.'s father, not Rick, (6) and that she was living in a two-bedroom home with her father, Angie, Amy, and DeMont, who were all willing to provide support for A.L. and D.L. in the event of their return. The court entered a de novo order of termination based on this evidence and the transcript of the November 15, 2013, final hearing.

Only one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.— Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). "If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights." *K.W.*, 335 S.W.3d at 769.

First, we conclude that the evidence was sufficient to establish ground E under Section 161.001(1) of the Texas Family Code. The Department alleged that Lee engaged in conduct which endangered A.L.'s and D.L.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E). Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *E.N.C.*, 384 S.W.3d at 803. It "means to expose to loss or injury." *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). This statutory ground for termination "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *Id.* at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "The conduct to be examined includes what the parent did both before and after the child was born." *Id.*; *E.N.C.*, 384 S.W.3d at 804–05. "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) However, termination under this ground "must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *Id.* at 436.

"Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see In re J.T.G.*, 121 S.W.3d 117, 125–26 (Tex. App.—Fort Worth 2003, no pet.). Lee admits that drug addiction can establish an endangering course of conduct, but argues

13

that there is no evidence that Lee abused drugs in a manner that endangered the children. However, "[t]he specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct." *Perez*, 148 S.W.3d at 436; *In re N.K.*, 99 S.W.3d 295, 300 (Tex. App.—Texarkana 2003, no pet.).

Lee was a drug addict who had used methamphetamine for five years before the Department's involvement even though she was responsibile for raising young children. Lee (1) used methamphetamine while on deferred adjudication community supervision, (2) used K2, nonprescribed Hydrocodone, and methamphetamine after the Department's involvement in this case, and, (3) by her own admission, used methamphetamine while pregnant with her fourth child in June 2013.[6] Although Lee's drug assessment recommended inpatient drug treatment, Lee made no effort to follow that recommendation in spite of a court order requiring her to do so. Lee also failed to comply with other requirements in the Department's plan designed to ensure that she remained drug free.

"'[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.'" *J.L.B.*, 349 S.W.3d at 848 (quoting *N.S.G.*, 235 at 367–68). Thus, "intentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam).

---

[6]In a separate case, the Department sought to terminate Lee's parental rights to her fourth child. Evidence of how a parent has treated other children is relevant in determining whether a course of conduct has been established under ground E. *In re K.R.G.*, No. 02-12-00384-CV, 2013 WL 3179498, at *20 (Tex. App.—Fort Worth Mar. 21, 2013, pet. denied) (mem. op.). Lee's first child lived with her father, who was able to provide a safe and stable home.

14

Lee violated the terms and conditions of her deferred adjudication community supervision by using methamphetamine, failing to report regularly to her CSO, and failing to complete community service hours as ordered. As a result of Lee's decisions not to comply, Lee's children were made to witness their mother's arrest. The Kaufman County court found Lee guilty of a state-jail felony, thereby limiting her options for employment so that she could provide for her children. Although Lee was placed on regular community supervision in January 2013, she again failed to report, failed to complete community service hours as ordered, and failed to submit to drug testing in June, July, August, and September 2013. Once more, Lee was subjected to incarceration. A few days before the November 18, 2013, final hearing, Lee told Granger that she would rather go to jail than try and comply with the terms and conditions of her community supervision.

As a result of her decisions, according to DeMont, Lee had never been able to maintain steady employment. Before the Department's involvement, Lee had held only one job for as much as three months, and she relied entirely on Angie and DeMont for financial support. Despite being ordered to maintain steady employment, Lee was unable to secure any employment before the November 2013 termination hearing. During the pendency of the case, Lee allowed her children to sleep in close proximity to two unknown males. Lee also socialized with known drug users, engaged in a risky sexual encounter with a man she had just met, and, according to Shields, was more concerned with romance than with obtaining the return of her

15

children. The evidence showed that Lee's drug use, poor choices, and inability to provide for A.L. and D.L. would subject the children to an uncertain existence.[7]

In termination cases, "[w]hen there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts." *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005)). Based on all of the evidence introduced in this case, we conclude that the trial court could readily have reached the necessary firm conviction or belief that Lee engaged in a course of conduct which endangered the physical or emotional well-being of the children.

We also conclude that sufficient evidence showed that Lee violated ground O. The trial court also found that Lee had failed to comply with its order, a statutory ground supporting termination. Lee generally argues that the court's order was vague and that it is unclear whether Lee understood some requirements of the service plan. We disagree. On February 8, 2013, the trial court incorporated the Department's family service plan as its own order. Among other things, Lee was required to (1) attend, participate in, and successfully complete outpatient drug treatment and drug classes, (2) follow all recommendations of the drug and alcohol dependency assessment conducted by the Lakes Regional MHMR Center in Greenville, Texas, (3) refrain from drug or alcohol use during the pendency of the case, (4) obtain and maintain steady employment, (5) attend scheduled supervised visitation with the children, and (6) attend Narcotics Anonymous/Alcoholics Anonymous three times a week. Shields testified that she

---

[7]*See In re M.N.G.*, 147 S.W.3d 521, 539–40 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g) (noting that parent's prolonged history of unemployment and financial instability, among other things, indicates inability to provide for child, which is relevant consideration in trial court's finding of endangerment); *Doyle v. TDPRS*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied).

16

explained this plan to Lee in person, that Lee had a calendar highlighting dates requiring action on her part, and that Lee had no questions about the requirements of the family service plan. At the February 8 status hearing, the trial court specifically found that Lee understood the plan.

By her own admission, Lee testified that she failed to attend and complete the out-patient drug treatment and drug classes. Although the drug and alcohol dependency assessment produced a recommendation of in-patient treatment, Lee made no effort to follow the recommendation. Granger testified that Lee refused to take drug tests. At the June 3, 2014, de novo hearing, Lee testified that the last time she used methamphetamine was "over a year ago," while the Department's case was pending. It was uncontested that Lee had failed to maintain any steady employment. Lee had missed nine scheduled visits with the children and had not attended Narcotics Anonymous or Alcoholics Anonymous as ordered.

Lee's compliance with some of the terms of the service plan was insufficient to avoid a finding of termination under Section 161.001(1)(O) of the Texas Family Code. *In re C.M.C.*, 273 S.W.3d 862, 875 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (substantial compliance insufficient to avoid termination under ground O); *see In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet); *In re C.R.*, 263 S.W.3d 368, 373–74 (Tex. App.—Dallas 2008, no pet.). The trial court's finding under Section 161.001(1)(O) was based on clear and convincing evidence of Lee's noncompliance with its orders.

17

We conclude that legally and factually sufficient evidence supports the trial court's predicate findings under Section 161.001(1).[8]

We also conclude that sufficient evidence established that termination was in the best interests of the children.

There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome the presumption. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.). In deciding whether termination would be in the best interest of the child, the trial court may consider this nonexclusive list of factors, known as the *Holley*[9] factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

---

[8]Lee argues that the evidence is insufficient under Section 161.001(1)(D) of the Texas Family Code. "Under subsection (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct." *N.R.*, 101 S.W.3d at 776; *see* TEX. FAM. CODE ANN. § 161.001(1)(D). Lee contends that there is no evidence (1) that she used drugs in front of the children, (2) that the trailer homes were not appropriate homes for the children, or (3) that Angie or DeMont endangered the children. As there is ample evidence to support at least one other statutory ground of termination, we need not address this argument.

[9]*Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976).

18

*Holley*, 544 S.W.2d at 371–72; *In re K.S.*, 420 S.W.3d at 855. It is unnecessary to prove all of these factors as a condition precedent to parental termination. *C.H.*, 89 S.W.3d at 27.

Also, evidence offered to prove grounds for termination, contact between the natural parent and child, degree of financial support, quality of care rendered by a child's care giver, and their willingness to adopt are all relevant to determining if termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 28; *In re J.W.M. & L.P.M.*, 153 S.W.3d 541, 548–49 (Tex. App.—Amarillo 2004, pet. denied). "A parent's lack of education, training, or misfortune is considered when reviewing excuses for acts or omissions of a parent; however, these considerations do not negate evidence tending to show that termination is in the child's best interest." *Jordan*, 325 S.W.3d at 732 (citing *In re S.H.A.*, 728 S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref'd n.r.e.)).

While D.L. was too young to make his desires known, Ponder testified that A.L. cried for Lee and asked to go home with her. We find that the first *Holley* factor weighs against termination. *See E.N.C.*, 384 S.W.3d at 808.

Due to their age, the emotional and physical needs of A.L. and D.L. now and in the future are great. Ponder suggested that A.L. might require counseling. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.). DeMont testified that Lee was unable to support herself and that Lee relied on her and Angie to provide money for the children's physical needs. At the time of trial, Lee had no income or home of her own. Shields testified that Lee was more

concerned with romantic relationships than securing the return of her children. Lee missed nine scheduled visitations, causing anxiety in A.L. According to Granger, Lee would rather be incarcerated for a state-jail felony than attempt to comply with the terms and conditions of her community supervision. Although Lee's parental rights had not been terminated to her first child, Lee's first child lived with her father and was cared for by him. The evidence in this case suggested that Lee was incapable of meeting the children's emotional and physical needs. On the other hand, although A.L. was experiencing some natural anxiety caused by the separation, Fulbright testified that A.L. and D.L. were thriving at the home of their foster parents and that she was confident that the foster family would be able to meet A.L.'s and D.L.'s emotional and physical needs. We find that the second *Holley* factor weighs in favor of termination.

Next, Fulbright testified that she believed the children might be in danger if returned to Lee. "Evidence of past misconduct or neglect can be used to measure a parent's future conduct." *In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 WL 2069281, at \*7 (Tex. App.—Waco May 15, 2014, pet. filed) (mem. op.) (citing *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.")); *see In re B.A.*, No. 04-13-00246-CV, 2013 WL 4679089, at \*1 (Tex. App.—San Antonio Aug. 28, 2013, no pet.) (mem. op.) (failure to complete classes and counseling "directly related to underlying reasons of the children's removal . . . is evidence that the children would continue to be in danger if they were returned to her"). The trial court could have found that Lee's drug addiction, history of poor choices, inability to provide for either herself or any of her children, failure to complete drug treatment, and possible future

20

incarceration should she be unable to successfully complete her community supervision presented an emotional and physical danger to A.L. and D.L. now and in the future. We find that the third *Holley* factor weighs in favor of termination.

Due to the fact that the children were often in the possession of Angie and DeMont during the pendency of the case, Lee's parental ability is questionable. Bryant testified that, while Lee's home was cluttered and the children were dirty, they were, "for the most part[,] . . . okay." The evidence demonstrated that Lee had attended parenting classes. Beyond testimony that the foster family was loving, provided the children with structure, and applied rules consistently, the Department did not present evidence of the parental abilities of the foster family. We find that the fourth *Holley* factor is neutral. *See E.N.C.*, 384 S.W.3d at 808.

The Department had many programs available to assist Lee to promote the best interests of her children. However, the evidence at trial demonstrated that, although Lee was under court order to complete some of these programs, she was unable to do so. Lee failed to take advantage of the Department's counseling program, assistance that would pay for out-patient treatment, in-patient treatment programs available to her, GED classes, and Narcotics Anonymous classes. We find that the fifth *Holley* factor weighs in favor of termination.

Because Lee's parental rights to her first child had not been terminated, Lee desired for A.L. and D.L. to be returned to her so they could continue their relationship with their older sister. Yet, at the time of the de novo hearing, Lee still had no income. Her plan was to move the children into a two-bedroom home with her dad, Angie, DeMont, and Amy, who was also a methamphetamine addict and the person with whom Lee most often used methamphetamine.

21

While DeMont testified that she loved the children and wanted them to move in with her, the Department introduced ample evidence showing that neither DeMont nor Angie were capable of following the Department's plan to ensure the children's safety. The Department discovered that Angie and DeMont were allowing Lee unsupervised visitation with the children in violation of their initial and first amended safety plans. On one such occasion, despite serious allegations of prostitution involved in this case, the children were found sleeping in a trailer with Lee, Amy, and two unknown males. Lee's plan for the children placed them in danger as a direct result of Lee's and Amy's risky behavior. On the other hand, Fulbright testified that the foster family that was providing a stable home for the children was interested in adopting both A.L. and D.L. We find that the sixth and seventh *Holley* factors weigh in favor of termination.

Lee's history of drug abuse, lack of income or a home of her own, failure to take advantage of benefits available to her by the Department, placement of her romantic relationships above the needs of the children, failure to remain drug-free while under investigation and on community supervision, noncompliance with the Department's service plans, and other acts and omissions during the pendency of the case indicated that the existing parent-child relationship was not a proper one. Lee testified that no one would hire her because she was pregnant, but Lee did not become pregnant until March 2013 and had failed to secure employment or otherwise provide the Department with information that she had applied for jobs before her 2013 pregnancy. Although her fourth child had already been born, Lee still had no job at the time of the de novo hearing. Lee's excuses for lack of cooperation with the Department included lack of transportation and money. However, there was testimony that the

22

Department secured assistance to pay for Lee's out-patient treatment, that DeMont was willing to pay expenses for Lee's treatments before the loss of her home, and that DeMont was willing to drive Lee to various appointments. We find that the eighth and ninth *Holley* factors weigh in favor of termination.

Considering the *Holley* factors, and in light of all the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Lee's parental rights was in the best interests of A.L. and D.L. Therefore, we conclude the evidence was legally and factually sufficient to support the court's best-interest finding.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:      September 18, 2014
Date Decided:        October 8, 2014

23