# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-14-00815-CV

N. D., Appellant

v.

Texas Department of Family and Protective Services, Appellee

FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY,
NO. 13-0139-CPS1, HONORABLE SUZANNE BROOKS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

N.D. appeals the trial court's order terminating her parental rights to her children, L.D. and L.M.D, following a bench trial.[1] N.D. challenges the factual and legal sufficiency of the evidence to support the trial court's findings as to the statutory predicate grounds and the children's best interest. Because we conclude that the evidence was legally and factually sufficient, we affirm the trial court's order of termination.

### FACTUAL AND PROCEDURAL BACKGROUND

The appellate record shows that N.D. has a history with child protective services. In June 2011, the Texas Department of Family and Protective Services (the Department) received

---

[1] We use initials to refer to appellant, her children, and their father and N.D's husband, J.D., who voluntarily relinquished his parental rights and is not a party to this appeal. *See* Tex. R. App. P. 9.8.

allegations that N.D. had left L.D. in a bar with J.D., while he was drinking. In December 2011, the Department conducted an investigation following a report by a UPS driver that he had discovered L.D., who was three years old at the time, home alone.[2] During the investigation, the Department learned that J.D. had made suicidal threats and exhibited other unstable behavior. Based on concerns about J.D.'s drug use and instability and N.D.'s decisions in light of those factors, the Department removed the children from N.D.'s home in August 2012 and placed them in foster care.[3] In November 2012, the children were placed with N.D.'s parents. The Department subsequently removed them from the grandparents' care upon learning that the grandfather had driven off with the grandmother and left the children alone on the front porch.[4] A protective order was issued to prevent J.D. from coming to N.D.'s home, and N.D. filed for divorce. N.D. cooperated in keeping J.D. from the home and completed her court-ordered services, and the children were returned to N.D. in June 2013. The Department monitored their care until November 2013, at which time it dismissed the case.

After the protective order ended on November 14, 2013, N.D. allowed J.D. to return to the home. N.D.'s father expressed concerns that J.D. was living with N.D., and N.D. agreed to let the children live with her parents. Nonetheless, L.D. continued to go back and forth between the

---

[2] According to testimony, J.D. was incarcerated on charges related to leaving L.D. home alone. Following his release, he met with the Department and signed a service plan, but he made no progress on the plan and eventually relinquished his parental rights prior to the Department's petition for termination in this case.

[3] L.M.D. was born on April 30, 2012, during the investigation.

[4] It is not clear from the record where the children were placed following removal from the grandparents' care.

two homes. Approximately a week after the first case was dismissed, while L.D. was in the home, there was an incident in which a known drug user assaulted N.D. and J.D. with a knife. Approximately one week later, the Department received a report of new concerns about the children's safety. The police had arrived at the home in response to reports that there was drug manufacturing and selling in the home. The police found three glass pipes believed to be drug paraphernalia, but subsequent testing revealed no illegal substance, and no charges were pursued. The children were temporarily placed with N.D.'s parents pending an emergency family meeting. At the family meeting, J.D. admitted to using methamphetamine. N.D. denied drug usage.

The Department filed a petition for termination of parental rights and was named temporary managing conservator of L.D. and L.M.D. J.D and N.D. were ordered to submit to random drug testing. J.D. tested positive for methamphetamine. N.D. tested positive for methamphetamine once but tested negative on all subsequent drug tests. At a status hearing in January 2014, N.D. was ordered not to have contact with anyone with a criminal or drug history. In July 2014, N.D. was arrested and charged with four felony counts of manufacturing and delivering a controlled substance and one misdemeanor assault charge.[5]

The final hearing was held in January 2015. The witnesses included N.D., who was still incarcerated pending disposition of the criminal charges; the Department caseworker, Todd Luis Serpico; and the CASA volunteer who served as guardian ad litem, Laura Hancock. N.D. testified that the Department had been involved with her children the majority of their lives. She

---

[5] The felony counts were first-degree charges for manufacturing and delivery of methamphetamine, morphine, hydrocodone, and alprazolam. The assault misdemeanor charge involved an incident with N.D.'s former roommate.

stated that in November 2013, she tried methamphetamine and tested positive for methamphetamine in December 2013. She agreed that having children present where there is methamphetamine, having drug abusers at the home, making or selling drugs, and violence in the home would be a danger to her children's physical and emotional well being. N.D. further testified that she understood that one thing that would alleviate the Department's concerns was to make sure that J.D. was not around but that she had let him come back because he said he had changed. She stated that she understood the protective order expired on November 14, 2013, J.D. had moved in after that, and he was living with her in July 2013. She also stated that she was still married to him and they were still communicating in writing while they were incarcerated although she agreed that remaining in contact with him is not in the children's best interest. N.D. testified that a problem in her life is that she gets angry at J.D. but then reconciles with him. She also testified that she believed she was protecting her children by having them at her parents' home even knowing that her father had driven off and left them alone. However, she agreed that it is not in the children's best interest to have J.D. at her home and her children somewhere else. She explained that she had let L.D. come to the house at the time the knife incident occurred because it was Thanksgiving weekend, and L.D. wanted to see her father. N.D. also testified that she had been diagnosed with anti-social personality disorder and borderline bi-polar disorder but disagreed with the results. She agreed that the psychologist had expressed concerns that she would always put herself and J.D. before the interest of L.D. and L.M.D.

N.D. also testified that she had last worked in February 2014 for approximately three weeks and otherwise had not been employed in the last year, during which she had paid "some money here and there" but no child support. She testified that her children deserve to have a good

4

life, that she had not been able to provide that for quite awhile, and that she had made some bad choices in the last couple of years that were not in the children's best interest. She stated that she was currently incarcerated and could not provide a stable environment for her children "right now at this moment." N.D. also testified that she had completed all of her services except the basic and protective parenting classes, which she had not completed because she was incarcerated.

Serpico testified that he had been the caseworker for the majority of both cases involving N.D. He stated that N.D. had admitted to him on several occasions that she had left the children with J.D. at a bar while he was drinking. He also stated that during the first case, N.D. appeared to be doing well and making good choices, that she completed her services, that they discussed the danger J.D. brought into the home, that she said she understood that it was not okay to have him around, and that she began seeking a divorce. He then stated that unfortunately things were not as they had appeared. Serpico testified concerning the knife incident at the home, the police incident that triggered the second case, and the family meeting in early December 2013. He stated that N.D. initially denied drug use but later admitted that for an approximately six-week period from "late October through parts of November 2013," she had experimented with methamphetamine. He also stated that she had been ordered not to have contact with anyone with a criminal or drug history and that it was expressly explained to her that the prohibition included J.D., but she had not abided by that order. He testified that N.D. admitted in February 2014 that J.D. was still in the home and had told him in May 2014 that she had finally gotten him to move out, but that in July 2014 the police stated that they knew J.D. was still living there and had been seen walking in the neighborhood with weapons.

5

Serpico also testified concerning N.D.'s service plan. He stated that she had never provided any sign-in sheet for narcotics anonymous classes and that she did not seek unemployment when she was laid off and had been unemployed for many months, getting behind in her mortgage and car loan payments. Serpico testified that he believed N.D. had knowingly placed or allowed the children to be placed in a situation that endangered their physical and emotional well-being because she understood the dangers J.D. brought and had admitted to allowing those "very dangerous factors" around her children. He further testified that he believed that N.D. had engaged in conduct that endangered their physical and emotional well-being because in addition to the conduct for which she was arrested, she had taken the children to stay with their grandparents even after the Department had removed them from the grandparents because of concerns of their being left home alone by the grandparents. Finally, he testified that he believed termination of N.D.'s parental rights was in the children's best interest because, despite the fact that N.D. loved her children, over an extended period of time she had shown an inability to provide a safe, stable home.

Hancock, the CASA volunteer who served as guardian ad litem, testified concerning the time she had spent with the children, their therapist, N.D. and the psychologist who examined her, the grandparents, the foster parents, L.D.'s teacher, and L.M.D.'s day care director. Her report was admitted as an exhibit. In the report, Hancock stated that the foster placement was an excellent situation for the children, that they were well cared for, had the appropriate level of structure and discipline, participated in activities outside the home, including church, and both had a solid bond with the foster parents. She stated that she recommended termination of N.D.'s parental rights because although N.D. loves her children, she had been unable to commit to completing her services

6

and can maintain a safe home only for the short term but not for the long term. Hancock testified that L.D. and L.M.D. needed a stable and permanent placement as soon as possible and that being in "limbo" while N.D. went "up and down" was bad for them. She observed that the case had been going on for two years—almost all of L.M.D.'s life—and that while the oldest knows her mother and had "some bond," L.M.D., "not as much."

After the close of evidence, the trial court determined that N.D.'s parental rights should be terminated based on subsections (D), (E), and (O) of section 161.001(1) of the Family Code and its finding that termination of N.D.'s parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(1)(D), (E), (O), (2). In response to N.D.'s request, the trial court issued findings of fact and conclusions of law. This appeal followed.

**DISCUSSION**

**Burden of Proof and Standard of Review**

To terminate a parent's rights to a child under section 161.001 of the Family Code, the Department must establish that (1) the parent has committed conduct prohibited by section 161.001(1), and (2) termination is in the best interest of the child. *See id.* § 161.001(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Because "'termination is a drastic remedy and is of [great] weight and gravity,'" *see In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)), grounds for termination must be supported by clear and convincing evidence, Tex. Fam. Code §§ 161.001, .206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (due process requires clear and convincing standard of proof in parental termination cases). The clear and convincing standard is "'that measure or degree of proof which will produce in the

mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re C.H.*, 89 S.W.3d at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code § 101.007 (defining clear and convincing evidence). Although "parental rights are of constitutional magnitude," "it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

N.D. raises legal and factual sufficiency challenges to the evidence. When reviewing the legal sufficiency of the evidence to support a termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. In conducting a factual sufficiency review of the evidence to support a termination finding, we review the record to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25; *see also In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (describing factual sufficiency review in context of termination finding and noting that appellate court "must give due deference to a [factfinder's] factfindings" and "not supplant the [factfinder's] judgment with its own judgment").

**Statutory Predicate Grounds**

In her first and second issues, N.D. challenges the legal and factual sufficiency of the evidence to support the trial court's findings as to statutory grounds found in section 161.001(1)(D), (E), and (O). Because termination of a parent's rights can stand on one statutory ground plus a best interest finding, we limit our review to the evidence to support the ground set out in subsection (E)—that the parent "engaged in conduct or knowingly placed the child with persons who engaged

8

in conduct which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code § 161.001(1)(E); *In re A.V.*, 113 S.W.3d at 362 (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* The relevant inquiry under section 161.001(1)(E) is whether evidence exists that the endangerment of the child's well-being was "the direct result of Appellant's conduct, including acts, omissions, or failures to act.*" In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citation omitted). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.*

In challenging the trial court's finding under section 161.001(1)(E), N.D. focuses on the trial court's statements in finding of fact number 7 that N.D. "admitted to allowing violent[] drug users around the home where her children resided" and "continued to allow [J.D.] around the children despite his illegal drug use and after his parental rights were terminated . . . ." N.D. contends that there was no evidence she was aware of the potential for danger and that because of her concerns that the violent drug user might retaliate, she moved her children to her parents' home.

9

N.D. also argues that there was no evidence that J.D. used or was under the influence of illegal substance around the children and that relinquishment alone is not evidence of neglect or abuse.

However, N.D. testified that she was aware from the first Department case that there was a concern about J.D.'s living with her, that she was aware of and abided by the protective order keeping him from the home, and that she understood that the children were returned to her because of the protective order that kept J.D. away. The evidence showed that N.D. was counseled on and understood the danger that J.D. brought by being in the home, yet she admitted that she allowed him to return to the home almost immediately after dismissal of the first case, was aware that he used methamphetamine at the time, allowed L.D. to be around him, and continued to allow him to live with her even after the knife incident. N.D. also admitted that moving the children to her parents' home and allowing J.D. to stay in her home was not in the children's best interest. The trial court ordered N.D. not to have contact with anyone with a criminal or drug history, and the caseworker testified that it was expressly explained to her that the prohibition included J.D. and that N.D. failed to comply with that order. The caseworker also testified that N.D. admitted to experimenting with methamphetamine from "late October through parts of November 2013," and the evidence showed that N.D. tested positive for methamphetamine during the pendency of the case, was subsequently arrested for manufacturing and delivering controlled substances and for assault, and remained incarcerated at the time of the hearing.

The trial court could have credited this evidence of illegal drug use, continued contact with J.D. despite knowing the dangers he brought, violence in the home, and alleged criminal activity and incarceration to find that N.D. engaged in a conscious course of conduct that endangered

10

her children. *See In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) ("'Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.'") (quoting *In re N.S.G.*, 235 S.W.3d 358, 367–68 (Tex. App.—Texarkana 2007, no pet.)); *In re M.E.-M.N.*, 342 S.W.3d at 263 ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being."); *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re S.M.L.* 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("Incarceration alone will not support termination, but it is an appropriate factor to consider in evaluating a parent's course of conduct endangering the child.") (citations omitted); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being of the child.") (citation omitted)).

Viewing the evidence in the light most favorable to the endangerment finding under subsection (E), we conclude that the trial court could have formed a firm belief or conviction that N.D. "engaged in conduct . . . which endanger[ed] the physical or emotional well-being of the child[ren]." *See* Tex. Fam. Code § 161.001(1)(E); *In re J.F.C.*, 96 S.W.3d at 266. Further, based on our review of the record, we conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction about the truth of the Department's endangerment allegations against N.D. *See In re C.H.*, 89 S.W.3d at 25. Thus, we conclude that the evidence was

11

legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), overrule N.D.'s second issue as to finding of fact number 7, and decline to address her first issue and the remainder of her second issue. *See In re A.V.*, 113 S.W.3d at 362.

**Best Interest Finding**

In her third issue, N.D. challenges the trial court's finding of fact number 10 that "under the totality of the circumstances," termination of N.D.'s parental rights was in the best interest of L.D. and L.M.D. Initially, N.D. argues that the trial court failed to apply the proper standard in its best interest analysis because the correct standard is that articulated in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), not "totality of the circumstances." While we agree that we are to assess the best interest of the children by applying the factors set out by the supreme court in *Holley*, the trial court is given wide latitude in determining the best interest of a minor child, *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982), and we do not agree that the trial court's reference to its consideration of all of the circumstances presented precluded its consideration of—or establishes that it did not consider—the *Holley* factors. We construe the remainder of N.D.'s arguments in issue three as a challenge to the legal and factual sufficiency of the evidence to support the best interest finding and review the evidence as to the *Holley* factors. *See Holley*, 544 S.W.2d at 371–72.

The factors courts are to consider include the (i) desires of the child, (ii) emotional and physical needs of and danger to the child now and in the future, (iii) parental abilities, (iv) plans for the child by the individual or agency seeking custody, (v) programs available to assist the individual to promote the best interest of the child, (vi) stability of the home, (vii) acts or omissions

12

of the parent that may indicate that the existing parent-child relationship is not a proper one, and (viii) any excuse for the acts or omissions of the parent. *Id.*; *see also* Tex. Fam. Code § 263.307(a), (b) (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). This list of factors is not exhaustive, not all of them are present in every case, not all of them need to be proven to determine a child's best interest, and analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the children. *In re C.H.*, 89 S.W.3d at 27; *Holley*, 544 S.W.2d at 372; *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds*, *In re J.F.C.*, 96 S.W.3d at 367 n.39. Further, evidence presented to satisfy the predicate statutory ground finding may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28.

Many of the *Holley* factors are implicated here. The guardian ad litem's report reflects that L.D., age six at the time of the hearing, had expressed a desire to live with her mother, her aunt and uncle, and her foster parents at various times during the case. Her report noted that L.M.D., age two and one-half at the time of the hearing, was too young and nonverbal to express any desires. Concerning their needs, the guardian ad litem testified that L.D. and L.M.D. needed a stable and permanent environment as soon as possible and that leaving them with N.D. and "allow[ing] her to go up and down and try different things [was] bad for the girls." In addition, the caseworker testified that the children were at "a very important age, especially L.M.D.," and needed stability, safety and a "home that could provide for them."

13

As for present emotional and physical dangers, N.D. argues that the Department's allegations that N.D.'s continuing contact with J.D., methamphetamine use, and incarceration posed dangers to the children fail because the caseworker testified that N.D. understood it was inappropriate to have drugs around and that spurred her to seek divorce. N.D. also argues that she testified that she permitted J.D. to have contact with the children only because he told her he was no longer using drugs and L.D. missed her father, an excuse for her actions. And N.D. argues that there was no evidence as to any future emotional and physical dangers. However, the evidence showed that N.D. continued to allow J.D. in the home despite her acknowledgment that his presence posed a danger to the children. Moreover, even if we were to assume that J.D.'s assurances that he was not using drugs and L.D.'s missing her father excused N.D.'s initial decision to allow him to return, the trial court could have reasonably determined that they did not excuse her continuing to permit him in the home when his assurances that he was not using drugs proved not to be true. As for future dangers, the evidence showed that N.D. was still married to J.D. and was still communicating with him while both were incarcerated despite her admission that it was not in the children's best interest. Moreover, "a fact finder may infer that past conduct endangering the well being of a child may recur in the future if the child is returned to the parent." *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied). The trial court could have credited this evidence, along with evidence of N.D.'s conduct that led to her arrest and her incarceration, as evidence that the children faced present and future emotional and physical dangers if they remained in N.D.'s care.

Concerning her parenting abilities, N.D. argues that she completed all of her first service plan and portions of her second service plan, that she showed protective behaviors by

14

removing the children from her home when she believed they were at risk, and that she pursued counseling for co-dependency on her own initiative. However, the guardian ad litem recommended termination because N.D. had be unable to complete her services regularly and was unable to commit to doing the things necessary to be a protective mother for the long term and because the children needed to be in a permanent, safe, and stable home. The evidence also showed that N.D. took the children to her parents' home even after the Department had removed the children from the grandparents for leaving them at home alone, and N.D. testified that it was not in her children's best interest for J.D. to be in the home and the children to be living somewhere else. The trial court could have credited this evidence and determined that N.D. did not possess the appropriate parenting abilities.

N.D. also challenges the trial court's finding that "N.D.'s incarceration was the reason N.D. did not have safe housing for her children." However, finding of fact number 8 simply states that N.D. "has been incarcerated since July and does not have a [sic] safe housing for the children," a circumstance to which N.D. admitted. Moreover, N.D.'s arguments on this point are based on subsections (N) and (Q) of section 161.001(1), statutory grounds not found by the trial court. *See* Tex. Fam. Code § 161.00(1)(N), (Q). The trial court's finding of fact number 9 included a finding that N.D. "is not capable of providing the children with a safe and stable environment," and there was evidence to support this finding. The caseworker testified that he believed termination was in the children's best interest because over an extended period of time N.D. had shown an inability to provide the kind of stable home that they need. The guardian ad litem expressed concerns that N.D. had not been able to commit to doing what was necessary to provide a safe home for L.D. and

15

L.M.D. for the long term. And N.D. testified that whether her parental rights should be terminated was "a hard question for [her] to answer" and that her children "deserve to have a good life," but she admitted that she had not been able to provide that for "quite a while" and that she had made poor choices in the last couple of years that were not in her children's best interest.

Viewing the evidence in the light most favorable to the best interest findings, we conclude that the trial court could have formed a firm belief or conviction that terminating the parental rights of N.D. was in the best interest of the children. *See* Tex. Fam. Code § 161.001(2); *In re J.F.C.*, 96 S.W.3d at 266. Further, based on our review of the record, we conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction that termination of the parental rights of N.D. was in the best interest of the children. *See In re C.H.*, 89 S.W.3d at 25. Therefore, we conclude that the evidence was legally and factually sufficient to support the best interest finding. We overrule N.D.'s third issue.

## CONCLUSION

Having overruled N.D.'s dispositive issues, we affirm the trial court's order of termination.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed

Filed: April 16, 2015

16