

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-18-00117-CV

---

IN THE INTEREST OF J.P. AND
J.P., CHILDREN

----------

FROM THE 235TH DISTRICT COURT OF COOKE COUNTY
TRIAL COURT NO. CV16-00622

----------

## MEMORANDUM OPINION[1]

----------

Appellant M.G. (Mother) appeals the trial court's judgment terminating her parental rights to her children J.P. (John) and J.P. (Jackson).[2] In one issue, she contends that the evidence is legally and factually insufficient to support the trial

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and their relatives throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

court's finding that termination of her parental rights is in the children's best interest. We hold that the evidence is sufficient to support termination, and we affirm the trial court's judgment.

## Background

Mother has a long history of using illegal drugs. She began using methamphetamine when she was nineteen years old, and her addiction to that drug continued through the time of the termination trial, when she was forty. She was sober from 2000 to 2009, but she relapsed when a paramour "got [her] back into the addiction." She also used marijuana when she was twelve years old and as late as 2016, and she has misused prescription medications.

Mother also has a history of involvement by Child Protective Services (CPS) with her children: John, Jackson, and two older children who are not subject to this appeal. In 2012, CPS determined that Mother had neglected her supervision of a child. In the course of Mother consummating a drug deal, one of her children was found to be filthy while sitting in a car that had food all over its floor.

Mother gave birth to John in May 2010 and to Jackson in June 2013. She conceived John with J.G. (Father) in 2009 while she was living with C.P. (Cody) and while Cody was at work.[3] According to Mother, Father came over one night

---

[3]The evidence does not identify Jackson's father. In its original petition, the Department alleged that Cody was Jackson's father, and Mother told the Department that Cody was his father. A DNA test proved otherwise.

2

and they "just . . . started hanging out" and had sex. Mother became pregnant the first time she had sex with Father, and their intimate relationship continued thereafter. She was not sure that John was Father's son until she saw him upon his birth and determined that he looked like Father. Father has a criminal history; in 2015, he was convicted for committing a drug-related offense.

In October 2015, Mother was arrested in Oklahoma for possessing methamphetamine and drug paraphernalia, including syringes. She pleaded guilty to that offense, and the Oklahoma court placed her on probation. In April 2016, she tested positive for methamphetamine. She went to an inpatient drug treatment facility in the summer of 2016, but only one week after her discharge, she began using methamphetamine again. Soon thereafter, in August 2016, she was arrested in Cooke County, Texas for possessing pills for which she did not have a prescription.

In October 2016, the Department of Family and Protective Services (the Department) filed a petition seeking termination of Mother's parental rights to John and Jackson if her reunification with them could not be achieved. To the petition, the Department attached an affidavit explaining events leading to the filing of the petition, including that Mother had recently used methamphetamine and that she had been arrested for possessing the pills. The Department asked the trial court to order the removal of John and Jackson from Mother's legal custody.

3

After a hearing, the trial court found that allowing the children to remain in Mother's custody would be contrary to their welfare, authorized their removal, and named the Department as their temporary managing conservator. The court ordered Mother to complete several services, including a psychological evaluation, counseling, parenting classes, and drug assessments. The Department filed a service plan that incorporated these services and added other requirements. CPS arranged for weekly visits between Mother and the children.

By Mother's admission, at the time of the children's removal, her life was a "wreck." She was using drugs, was unemployed because of her refusal to apply for jobs, and was not primarily responsible for caring for the children. According to her, the children were being neglected. Upon their removal, Mother urged CPS to consider her sister's residence as a placement, but CPS could not place the children there because her sister tested positive for methamphetamine.

In February 2017, after Mother failed to report to her probation officer in Oklahoma, she tested positive for methamphetamine. She was arrested, resulting in her incarceration through virtually the duration of the Department's termination case. The Oklahoma court sentenced her to ten years' confinement but ordered that the sentence would be suspended upon her completion of a regimented drug treatment program. Mother completed the program, and she was released one week before the March 2018 termination trial. Upon her release, she began living with her parents, submitting employment applications to various employers, and attending outpatient drug treatment.

4

Because of Mother's confinement for most of the proceedings in the trial court, she attended only a few visits with John and Jackson. Also because of the confinement and because of choices she made before the confinement, she did not complete requirements of her service plan. For example, before her confinement, she was discharged from counseling because of nonattendance. Also before her incarceration, Mother missed visits with John and Jackson. She completed parenting classes and started (but did not complete) a psychological evaluation.

In March 2018, after hearing the parties' evidence and arguments, the trial court granted the Department's termination petition. Among other findings supporting termination, the trial court found that clear and convincing evidence proved that termination of Mother's parental rights is in John's and Jackson's best interest. Mother brought this appeal.

**Evidentiary Sufficiency to Prove Best Interest**

Mother contends that the evidence is legally and factually insufficient to show that termination of her parental rights is in John's and Jackson's best interest. In a termination case, the State seeks to erase parental rights permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West Supp. 2017); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Thus, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally

5

fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child.[4] Tex. Fam. Code Ann. § 161.001(b) (West Supp. 2017); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

In evaluating the evidence for legal sufficiency in parental termination cases, we view all the evidence in the light most favorable to the termination findings to determine whether a factfinder could reasonably form a firm belief or conviction that the Department proved the challenged ground for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We resolve any disputed facts in

---

[4]In the summary of Mother's argument, she states that she is "not contesting that one or more of the grounds for termination were met" under section 161.001(b)(1) but that it is her "position that termination was not in the best interest of the children."

favor of the finding if a reasonable factfinder could and disregard all evidence that a reasonable factfinder could have disbelieved. *Id.*

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief of the challenged basis for termination. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the factfinder may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one,

7

and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

Under these factors, Mother's addiction to illegal drugs and her long-term drug use, including her use while this case was pending, support the trial court's finding that termination of her parental rights was in the children's best interest. *See In re J.L.B.*, 349 S.W.3d 836, 849 (Tex. App.—Texarkana 2011, no pet.); *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.); *see also In re K.G.-J.W.*, No. 01-17-00739-CV, 2018 WL 1161556, at *7 (Tex. App.—Houston [1st Dist.] Mar. 6, 2018, pet. denied) (mem. op.) (considering a parent's continuing use of narcotics during the pendency of a termination case as supporting a trial court's best-interest finding).

Mother conceded at trial that she has had several opportunities to break her addiction and that she has failed to do so. Although she testified that she was ready for sobriety because of skills that she learned at the treatment program that she had attended while confined and although (mostly because of her confinement) she had been sober for more than a year at the time of trial, the trial court could have doubted her ability to maintain sobriety based on her long history of using methamphetamine and other drugs despite her receipt of treatment and despite a previous lengthy period of sobriety.[5] *See In re C.M.*, No.

---

[5]Mother explained, "I have learned the skills and tools to live a better sober life. And I know I have made mistakes and made bad choices, but all I'm asking

8

01-15-00830-CV, 2016 WL 1054589, at \*11 (Tex. App.—Houston [1st Dist.] Mar. 17, 2016, no pet.) (mem. op.) (holding that a factfinder could have reasonably determined that a parent was unlikely to maintain sobriety when the parent had a long history of opiate use and a counselor testified that opiate users had a high rate of recidivism); *see also In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied) ("Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices."); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.").

The trial court could have also considered Mother's failure to complete services, caused in part by her confinement and occurring before her confinement, as a factor affecting the children's best interest. *See M.R.*, 243 S.W.3d at 821 ("A parent's . . . failure to comply with a family service plan support[s] a finding that termination is in the best interest of the child.").

Next, Mother admitted at trial that before their removal from her legal custody, the children were neglected. *See In re J.V.B.*, No. 01-17-00958-CV, 2018 WL 2727732, at \*9 (Tex. App.—Houston [1st Dist.] June 7, 2018, no pet. h.) (mem. op.) (stating that evidence of a child's neglect supports a trial court's best-interest finding); *In re H.M.O.L.*, Nos. 01-17-00775-CV, 01-17-00776-CV, 2018 WL 1659981, at \*18 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied)

---

is for a chance. I don't want to lose my boys." Mother testified that she did not learn such skills in shorter treatment programs in which she had previously participated, such as the summer 2016 inpatient treatment. She testified that she did not "take what [that inpatient program] offered."

9

(mem. op.) (stating that a parent's neglect of a child is an indication of a lack of parenting abilities). And the trial court received evidence corroborating that admission and showing John and Jackson's improvement to the point of flourishing in foster care. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (considering in a best-interest review that a child was neglected while in a parent's care but "healthy, happy, and well-adjusted" after being placed in foster care).

Shannon Sharp, a CPS caseworker, testified that the children had "blossomed" in their foster home, which included the foster parents, their two biological children, John, and Jackson. Concerning Jackson, Sharp explained,

> The youngest child . . . was very behind [upon his removal]. He didn't speak. He was very withdrawn. . . . [A]t the time that we removed, he was three. And he just didn't seem to be on the normal level of a [three year old]. And since being moved into that foster home, he just surprises me every time I go see him.
>
> . . . .
>
> . . . He speaks very well.
>
> . . . .
>
> . . . [P]rior to moving there, he seemed to have, in my opinion, some fear of other adults. And since he's been in that home, he's just open and chatty even and he will speak to other adults . . . at school or at the store. And prior to being in that home, he never did anything like that.

Concerning John, Sharp testified,

> [John] has done very well, also. He's seven now. At the time of removal, he was six. He was much more outgoing than his younger brother, but since being in the foster home, he's learned a little bit

10

about what rules are and . . . things that he needs to be responsible for. He has been diagnosed with ADHD. And I think that he really struggled with that prior to moving into the foster home. He started some treatment medication, and he's also seeing a therapist, and he's doing very well.

Jeanne Smith, a court-appointed special advocate and the children's guardian ad litem, similarly testified that John and Jackson were "doing great" in foster care. She explained that the children's interactions with adults had improved "tremendously" since their placement in foster care, that John was progressing well with his education, and that both boys were receiving appropriate medical care.

The evidence showed a strong bond among the foster family, John, and Jackson and a comparatively weak bond between the children and Mother. *See In re U.P.*, 105 S.W.3d 222, 230–31 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) (considering a child's bond with a foster family as a factor supporting the child's best interest in the termination of a father's parental rights). Sharp testified that John and Jackson refer to their foster mother as "mom" and refer to Mother by her first name. According to Sharp, Mother sent only three or four letters to the children while she was confined and was unable to visit them. Smith testified that neither John nor Jackson ever asked her about Mother.

When the Department's attorney asked Mother about who should care for John and Jackson if the trial court terminated her parental rights, she testified, "I would like them to be with family. But if not, I would like them to go back with the foster family." Mother acknowledged that the children's foster family had

11

arranged for John and Jackson to visit their older siblings. She also stated that she had been "told that [the children] were doing very well" in foster care. Mother acknowledged that the children are bonded with their foster family and that the foster parents want to adopt them.

Finally, the trial court could have reasonably determined that termination of Mother's parental rights to the children is in their best interest because it provides them with stability and permanence that they would otherwise lack. *See In re B.H.R.*, 535 S.W.3d 114, 124 (Tex. App.—Texarkana 2017, no pet.) (stating that "[s]tability and permanence are paramount in the upbringing of a child" and that a factfinder may consider that "the best interest of the child may be served by termination so that adoption may occur rather than the impermanent foster care arrangement that would result if termination were to not occur").[6]

Mother testified that at the time of the termination trial, she was not in a position to care for John and Jackson. Sharp opined that Mother did not understand the children's mental, emotional, and physical needs on the "level that she would need to" if the court returned the children to her care. Sharp asked the trial court to terminate Mother's parental rights to the children so that they could "achieve permanency." She explained that the foster family wanted to adopt the children immediately and that if the trial court denied termination, the

---

[6]On appeal, Mother proposes that the trial court should have denied the Department's termination petition while allowing the Department to maintain managing conservatorship of the children and while leaving the children in foster care.

12

Department would not consider returning them to Mother's custody for approximately one year while it waited to determine if she remained sober. Smith likewise recommended the termination of Mother's parental rights; she expressed her concern that if the trial court did not terminate the rights, Mother would relapse and the "kids would have to go through another upset." She added, "They're flourishing in a stable life now."

For all of these reasons, considering all of the evidence under the factors described above, we conclude that the trial court could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. §§ 101.007, 161.001(b)(2). We therefore hold that the evidence is legally and factually sufficient to support the trial court's termination judgment, and we overrule Mother's sole issue. *See J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28.

## Conclusion

Having overruled Mother's only issue, we affirm the trial court's judgment terminating her parental rights to John and to Jackson.

/s/ Wade Birdwell
WADE BIRDWELL
JUSTICE

PANEL: MEIER, GABRIEL, and BIRDWELL, JJ.

DELIVERED: August 9, 2018

13